**VALLEY VIEW ENTERPRISES, INC.**

v.

**The UNITED STATES.**

**No. 94–440C.**

United States Court of Federal Claims.

April 18, 1996.

Robert J. Sherer, Boston, Massachusetts, for plaintiff.

Elizabeth A. Rinaldo, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Capt. Maria Chapa, U.S. Army, of counsel.

## OPINION

YOCK, Judge.

This case comes before the Court on the plaintiff's motion for summary judgment and the defendant's renewed motion to dismiss or, alternatively, to transfer this case to the Armed Services Board of Contract Appeals (ASBCA) pursuant to 41 U.S.C. § 609(d) (1994). The plaintiff argues that it has been ordered to do work beyond the scope of its contract and that it is not obligated to perform the work unless the contracting officer issues a change order. The defendant maintains that this Court lacks jurisdiction over the plaintiff's Complaint because it raises a matter of contract administration, and thus the plaintiff's claim here is premature. According to the defendant, the proper course for the plaintiff is to perform the work and then seek an equitable adjustment. Alternatively, the defendant seeks to transfer the Complaint to the ASBCA where the plaintiff is pursuing another claim arising from the same contract. After careful consideration of this matter, the Court grants the defendant's motion to dismiss for lack of jurisdiction, and denies the plaintiff's motion for summary judgment.

### Factual Background

On September 22, 1992, the Department of the Army, United States Military Academy, awarded Contract No. DAAG60–92–C–0118 to the plaintiff, Valley View Enterprises, Inc. The contract called for the replacement of steam lines located at the United States Military Academy, West Point, New York. The plaintiff maintains that by October 1993, ninety-five percent of the work required by the contract had been completed, and the system was in use. The contract required that the plaintiff furnish, install, and test an underground, insulated heat-distribution system and insulated steel pipe condensate return system consisting of piping and other devices necessary for a complete and operable system.

By letter dated November 29, 1993, the contracting officer advised the plaintiff that the Government had performed an inspection of welds and various lengths of pipe installed by the plaintiff under the contract, which revealed numerous deficiencies in welds and materials not in compliance with contract specifications. The letter indicated that the defendant considered the defects to be sufficiently severe to threaten the integrity of the entire system installed by the plaintiff. The letter further stated that the defendant was considering terminating the contract for default and was providing the plaintiff with ten days in which to respond.

By letter dated April 12, 1994, the contracting officer advised the plaintiff of the results of two independent inspections of the plaintiff's work. The letter indicated that all twenty-three welds selected at random for inspection by radiography failed to meet contract specifications. The letter also detailed other work that the defendant found to be in violation of contract specifications. Moreover, the letter stated:

> As previously conveyed to you the U.S. Military Academy considers the defects noted to be extremely serious and indicative of inferior workmanship on the whole project. Accordingly, you are hereby afforded an opportunity to submit, within 20 days, a satisfactory plan as to how your company intends on correcting, at no cost to the Government, the unacceptable work provided under the contract thus far. That plan should include specific approaches for replacement of the unacceptable work in a timely fashion, with as little impact on the Military Academy community as possible.

The letter also advised the plaintiff that failure to provide such a plan might result in termination of the contract for default.

By letter dated May 2, 1994, the plaintiff responded to the contracting officer's April 12, 1994 letter. In this letter, the plaintiff sought more information on the locations of many of the alleged deficiencies. The plaintiff also stated its belief that the majority of the conditions specified in the contracting officer's letter were not defects under the contract because they could not be detected under the inspection procedures provided for in the contract. The plaintiff further stated:

> [W]e consider your letter of April 12, 1994 to be a directive to us to perform work

clearly beyond the scope of our contract. As such, we consider it a written order for a change within the meaning of the "Changes Clause" of our contract for which we are entitled to an equitable adjustment in our contract amount. Within this context, our plan for performing the work you have directed us to perform is attached hereto.

The letter contained a schedule with procedures for additional testing and replacement of the work in question, indicating that the plaintiff agreed to perform the specified work and intended to finish the additional work prior to the original contract completion date of May 19, 1996. Also in the letter, the plaintiff requested a contracting officer's decision, under the Disputes clause, of the plaintiff's contract obligations under Specification Section 15052. The request for a contracting officer's decision was accompanied by an attempted certification.

On July 12, 1994, more than sixty days after the defendant had received the plaintiff's letter, the plaintiff filed its Complaint in this Court. The plaintiff's Complaint cites to 41 U.S.C. § 605(c)(5) (1994), the so-called "deemed decision" section of the Contract Disputes Act of 1978 (CDA), as amended, for its authority to file its Complaint directly with this Court.

On October 17, 1994, the defendant rejected the plan submitted by the plaintiff on May 2, 1994, and asked for a revised corrective plan to be submitted by November 4, 1994. On November 4, 1994, the Government recommended that the plaintiff be suspended from further Government contracting for suspected fraud in the performance of this contract. The plaintiff was suspended on November 9, 1994.

On January 30, 1995, the plaintiff filed a complaint with the ASBCA concerning the same contract. *Valley View Enterprises, Inc. v. Dept. of the Army*, ASBCA No. 48246 (filed Jan. 30, 1995). In its ASBCA complaint, the plaintiff appeals the contracting officer's denial of the plaintiff's delay claim stemming from the defendant's refusal to allow the plaintiff onto the job site to complete the plaintiff's remaining work. The contracting officer explained in her November-

ber 23, 1994 denial of the plaintiff's claim that the request was denied "based upon the fact that the entire delay is wholly attributable to the poor performance of Valley View Enterprises."

### Discussion

In the plaintiff's motion for summary judgment, the plaintiff seeks to have this Court determine that: (1) the contracting officer's failure to issue a decision constituted a deemed denial of the plaintiff's claim, (2) the contracting officer's direction to the plaintiff on April 12, 1994, was a directive to perform work beyond the scope of the contract, (3) the plaintiff is not obligated to perform that work at no cost to the Government, (4) the plaintiff is not obligated to perform the work designated in the April 12, 1994 letter except by a contract modification issued under the Changes clause, and (5) that the plaintiff has fully complied with the contract.

The defendant maintains that, under the Disputes clause in the contract, the plaintiff must do the work as requested by the contracting officer and then file a claim if the plaintiff believes it is entitled to additional compensation. The defendant further maintains that this Court lacks jurisdiction over the plaintiff's Complaint because the plaintiff's claim is not a nonmonetary dispute but rather a premature request for monetary relief lacking a sum certain. Alternatively, the defendant argues that if the plaintiff's claim is a nonmonetary dispute, there can be no deemed denial because the deemed denial provisions of the Contract Disputes Act only apply to monetary disputes. Further, in the event this Court determines that it has jurisdiction, the defendant seeks to have the Complaint transferred to the ASBCA where another claim on the same contract is pending.

In response to the defendant's jurisdictional arguments, the plaintiff contends that its May 2, 1994 letter to the contracting officer requesting a final decision on the plaintiff's contractual obligations constitutes an appealable claim over which this Court has jurisdiction under the Contract Disputes Act and the Tucker Act. For its compliance with the

Contract Disputes Act, the plaintiff refers us to the definition of a claim found in the regulations implementing the CDA, emphasizing the nonmonetary portion of the definition:

> *Claim,* as used in this subpart, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment *or interpretation of contract terms, or other relief* arising under or relating to the contract.

48 C.F.R. § 33.201 (second emphasis added by plaintiff). Moreover, the plaintiff relies on section 6(c) of the CDA for its theory that the defendant's failure to decide its claim within sixty days after receipt constituted a deemed denial. At the time the plaintiff submitted its attempted claim, the section stated in relevant part:

> (c)(1) A contracting officer shall issue a decision on any submitted claim of $50,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, * * *.

> (2) A contracting officer shall, within sixty days of receipt of a submitted certified claim over $50,000—

> (A) issue a decision; or

> (B) notify the contractor of the time within which a decision will be issued.

>    *     *     *     *     *     *

> (5) Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter.[1]

41 U.S.C. § 605(c) (1988 & Supp. V 1993). According to the plaintiff, these provisions require that for claims not exceeding $50,000, or for claims like the plaintiff's that seek only contract interpretation, the contracting officer must issue a decision within sixty days of

when the claim is submitted or be deemed to have been decided adversely to the contractor.

In addition, the plaintiff maintains that this Court has jurisdiction over its claim based on changes made to the Tucker Act by the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 907(b), 106 Stat. 4506 (1992). The 1992 Act expanded the jurisdiction of the United States Court of Federal Claims as follows:

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and *other nonmonetary disputes* on which a decision of the contracting officer has been issued under section 6 of that Act.

28 U.S.C. § 1491(a)(2) (1994) (as amended by the Federal Courts Administration Act of 1992 § 907(b)(1)) (emphasis added). The plaintiff argues that its Complaint falls under the category of "other nonmonetary disputes" under the Tucker Act because the plaintiff seeks to avoid performing the work at issue rather than receiving additional compensation. Specifically, the plaintiff states:

> [it] is more interested in obtaining a determination that it is not obliged to perform any further work on the Phase II contract except for completing the insulation and landscape work. Should [the plaintiff] prevail in this case, it will not perform any of the work demanded by the contracting officer's April 12 letter and the cost of doing that work will be a moot issue unless the Government chooses to have it done under a contract modification.

Plaintiff's Mem. in Opp'n to Def.'s Mot. to Dismiss and in Support of Pl.'s Mot. for Summ.J. (Nov. 7, 1994) at 11–12 (footnote and citation omitted).

The defendant responds that the plaintiff's action is nothing less than an improper ap-

---

1. The $50,000 threshold was subsequently increased to $100,000 by the Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, 108 Stat. 3243 (1994).

peal of a directive issued by the contracting officer during the course of contract administration. According to the Government, the matter really concerns the Government's exercise of its preacceptance rights under the Inspection clause in the contract.

The contract incorporates by reference several standard Federal Acquisition Regulation (FAR) clauses. The contract includes a Disputes clause which states in relevant part:

> (h) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

FAR 52–233–1, Disputes (APR 1984). The contract also contains an Inspection clause which states in relevant part:

> (f) The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements * * *.
>
> \* \* \* \* \* \*
>
> (h) If, before acceptance of the entire work, the Government decides to examine already completed work by removing it or tearing it out, the Contractor, on request, shall promptly furnish all necessary facilities, labor, and material. If the work is found to be defective or nonconforming in any material respect due to the fault of the Contractor or its subcontractors, the Contractor shall defray the expenses of the examination and of satisfactory reconstruction. However, if the work is found to meet contract requirements, the Contracting Officer shall make an equitable adjustment for the additional services involved in the examination and reconstruction, including, if completion of the work was thereby delayed, an extension of time.

FAR 52.246–12, Inspection of Construction (JUL 1966).

In addition, the contract contains a Changes clause, which provides in relevant part:

> (a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes—
>
> (1) In the specifications (including drawings and designs);
>
> (2) In the method or manner of performance of the work;
>
> \* \* \* \* \* \*
>
> (4) Directing acceleration in the performance of the work.
>
> (b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; *provided,* that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.
>
> \* \* \* \* \* \*
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

FAR 52.243–4, Changes (AUG 1987).

While disputes about the proper interpretation of contract specifications are not uncommon during the performance of Government contracts, it is unusual for a disagreement in the present stage of contract administration to reach this Court. The current impasse began after the Government determined that the plaintiff's work failed to comply with contract specifications. Following its determination, the Government ordered the plaintiff to submit a corrective plan. Although the plaintiff disagreed with the defendant as to the proper interpretation of the inspection requirements, the plaintiff eventually submitted two corrective plans, but neither was approved by the Government. The plaintiff now seeks to avoid performing the work al-

together and asks for a declaratory judgment to that effect.[2]

The proper path to resolving the disagreement before the Court is provided in the plaintiff's contract and in case law. The plaintiff's contract contains a Disputes clause which states in relevant part that "[t]he Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the contracting officer." FAR 52–233–1(h) (APR 1984).[3] Congress recognized the importance of the Disputes clause when it enacted the CDA:

> The rights of Government contractors * * * are unique since they have been required by the language of the contract, for example, * * * the disputes article, to perform the work as directed by the Government without stopping to litigate. Thus, Government contractors must perform and then argue about the amount of the equitable adjustment at some later time.

S.Rep. No. 95–1118, 95th Cong., 2d Sess. 32, reprinted in 1978 U.S.C.C.A.N. 5235, 5266. The duty to proceed as set out in the Disputes clause is independent of the plaintiff's agreement with the defendant's interpretation of the contract or whether the Government's interpretation is ultimately determined to be correct. Ralph C. Nash, Jr., Government Contract Changes 6–4 (2d ed. 1989). The duty is placed upon the contractor to protect the Government and to ensure that work does not cease while differences between the parties are resolved. As the United States Court of Claims explained:

> The covenant in the Disputes clause, which requires the contractor to proceed with the work pursuant to the contracting officer's orders pending an administrative appeal, is a provision inserted in the contract for the benefit of the government. The purpose of the covenant is to prevent

an interruption of the work and a consequent loss or detriment to the government while the administrative proceedings are in progress.

Schmid v. United States, 173 Ct.Cl. 302, 309–10, 351 F.2d 651, 655 (1965). See Dynamics Corp. of America v. United States, 182 Ct.Cl. 62, 77, 389 F.2d 424, 432–33 (1968) ("Th[e Disputes] clause protects an important interest of the Government by permitting it to continue to receive needed supplies on schedule, despite disputes which might arise during performance.") (footnote omitted).

The proper course for the contractor, if it believes it is being asked to do work beyond that called for by the contract, is to file a claim for an equitable adjustment, typically under the Changes clause, with the contracting officer. The "constructive change" doctrine permits the contractor to recover for such work. See Len Co. & Assocs. v. United States, 181 Ct.Cl. 29, 38, 385 F.2d 438, 443 (1967) ("[W]e, as well as the Armed Services Board of Contract Appeals, have held that, if a contracting officer compels the contractor to perform work not required under the terms of the contract, his order to perform * * * constitutes an authorized but unilateral change in the work called for by the contract and entitles the contractor to an equitable adjustment in accordance with the 'Changes' provision.") (footnote omitted).

As the Disputes clause makes clear, the remedy of an equitable adjustment is not pursued in lieu of performing the work. Ralph C. Nash, Jr., Government Contract Changes 6–4 (2d ed. 1989). To the contrary, the changes doctrine is fundamentally linked to the contractor's continued performance while the dispute is pending. See John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 430 (3d ed. 1995) ("Further reason[ ] for continued adherence to the constructive changes doctrine [is] that the contractor will be * * *

---

**2.** The plaintiff states that should it "prevail in this case, it will not perform any of the work demanded by the contracting officer's April 12 letter * * *."

**3.** Because its drafters believed that the Disputes clause conveyed the obligation to proceed for construction contracts, they did not include it again in the Changes clause. Ralph C. Nash, Jr., Government Contract Changes 6–2 (2d ed. 1989) (footnote omitted).

required to proceed with work pending resolution of disputes redressable under the contract."); *American Line Builders, Inc. v. United States,* 26 Cl.Ct. 1155, 1180 (1992) ("One of the purposes of allowing constructive changes is to ensure that the contractor will proceed with the work pending resolution of disputes for which redress is available under the Changes clause.")

■ The plaintiff in this case seeks to have this Court determine, during contract performance, that it need not perform work requested by the Government. Specifically, the plaintiff asks that the Court determine that the plaintiff is not obligated to perform the work designated in the April 12, 1994 letter except by a contract modification issued under the Changes clause. The plaintiff's attempt to link its obligation to perform to a change order must fail. There is no reason for the contracting officer to issue a change order if she believes the work at issue is called for by the contract. The plaintiff's request for judicial intervention at this time is an attempt to precondition its duty to proceed on a formal determination of liability in its favor. This procedure is inappropriate and thus the plaintiff's efforts are misdirected. The question to be resolved is not whether the contractor will perform the work at issue now but who will bear its cost in the future. The Government, by contract, has the right to unilaterally order the contractor to perform the work (if the parties cannot agree on what needs to be done).

As stated earlier, the Disputes clause requires that work be done *despite* a disagreement as to liability, leaving the determination of liability for a later date. Allowing a plaintiff to demand a judicial determination up front as to liability before performing disputed work would result in the very harm the duty to proceed is designed to prevent—delay. This delay could conceivably last for many months or even years as the case progresses through the court system.

The facts of this case are illustrative of the dangers of judicial involvement in contract administration. A ruling at this stage of contract performance would not necessarily resolve the current impasse between the parties. A ruling that the Government is correct that the plaintiff has not complied with the contract would add little to the current impasse over a corrective plan because the parties would still have to agree to an exact course of action, something they have been unable to do. Moreover, such a ruling is unnecessary to the completion of the work, as the plaintiff's duty to complete the work is independent of such a determination. On the other hand, if the plaintiff's interpretation of the specifications prevailed and the plaintiff was thereby able to avoid performing the additional work, the plaintiff would have successfully performed an end-run around its duty to proceed and would have interfered with the contracting officer's right to unilaterally direct performance under the Changes clause. Neither outcome is desirable. Both are avoidable.

In particular, if the plaintiff had pursued its monetary claim after it had agreed to a corrective plan and performed the work for the Government, the Court would then be in a position to resolve the dispute. The work would be completed, and the contract would be beyond the contract performance phase. The plaintiff would have satisfied its duty to proceed, and the Government would be spared a long period of delay. Moreover, an agreement on a plan and performance of the work or a unilateral order by the contracting officer to perform the work would result in a more sharply focused dispute before this Court.

The plaintiff's reliance on the Federal Courts Administration Act of 1992 as the source for this Court's jurisdiction is also misplaced. Prior to the 1992 Act, the Federal Circuit had held that contract appeal boards had jurisdiction over appeals from termination for defaults not associated with monetary claims, *Malone v. United States,* 849 F.2d 1441 (Fed.Cir.1988), but that this Court lacked such jurisdiction. *Overall Roofing & Constr. Inc. v. United States,* 929 F.2d 687 (Fed.Cir.1991). The Federal Courts Administration Act of 1992 expanded this Court's jurisdiction to include "a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of

the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2) (1994).

When Congress passed the 1992 Act, it gave no indication that it desired to relinquish the Government's contractual right to have the contractor perform pending resolution of disputes. Conversely, the sole legislative history concerning section 907(b)(1) cautions that the Court's new jurisdiction does not permit a contractor to seek declaratory judgments that would impede the contracting officer's right to order work to be completed:

> Subsection (b)(1) of section 907 will amend the Tucker Act to clarify the power of the Court of Federal Claims to hear appeals of all contracting officers' final decisions, regardless of whether the dispute involves a claim for money currently due. The amendment will restore the option of appealing any final decisions to either the Court of Federal Claims or agency board of contract appeals at [sic] was intended in the Contract Disputes Act. *The amendment does not authorize contractors to seek declaratory judgments from the Court of Federal Claims in advance of a dispute and final decision, and will not permit contractors to seek injunctions or declaratory judgments that would interfere with the contracting officer's right to direct the manner of performance under the changes clause.* A contracting officer's final decision under the Contract Disputes Act will remain a jurisdictional prerequisite to review by the Court of Federal Claims.

138 Cong. Rec. § 17799 (daily ed. Oct. 8, 1992) (statement of Sen. Heflin) (emphasis added). Moreover, this Court's refusal to interpret the 1992 Act as an open-ended invitation to bring any possible disagreement with the contracting officer, arising at any time in the contracting process, to this Court is consistent with the time-honored principle that waivers of sovereign immunity must be strictly construed. *See United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); Stan Hinton, *Post–Contract Disputes Act Jurisdiction over Nonmonetary Contract Disputes: A Critique of Malone v.*

*United States,* 19 Pub.Cont.L.J. 174 (1989) (noting that from its beginnings in 1855, Court of Claims' jurisdiction has been construed narrowly).

Finally, the plaintiff's reliance on *Garrett v. General Elec. Co.,* 987 F.2d 747 (Fed.Cir. 1993), also fails. *General Electric* involved a contracting officer's final decisions, after contract work was completed and accepted, requiring the plaintiff to correct defective engine parts at no cost to the Government. *Id.* at 748–49. At issue in the case was whether the Navy's directives under the contract's Inspection clause were appealable claims. *Id.* at 749. The United States Court of Appeals for the Federal Circuit found that they were appealable claims, determining that the directives to correct or replace defective engines constituted "other relief" within the FAR's third category of claims.[4] *Id.* The Court observed that the Navy's other two remedies, a price reduction or repayment of an equitable portion, were monetary remedies and reasoned that the Navy's choice of remedies should not dictate the viability of an appeal. *Id.* at 751–52.

In their opinions, both the ASBCA and the Federal Circuit repeatedly distinguish between a contract where work has been accepted and one where work has not been and limit their holdings to the former. *See, e.g., General Elec.,* 987 F.2d at 751–52 (*"Following performance under the contract,* the Navy revoked *final acceptance* and chose to pursue a nonmonetary form of relief under the contract. The Navy's choice of remedy, *after acceptance of performance,* should not dictate the viability of an appeal.") (emphasis in original); *Id.* at 753 ("[I]t is important to note that the Board's majority was careful to limit its decision respecting what is a government 'claim,' to the situation where goods had been *accepted* by the government and the acceptance was *withdrawn.*") (emphasis in original) (Nies, Chief J., dissenting); *General Elec. Co.,* ASBCA 36005 et al., 91–2 BCA ¶ 23,958, at 119, 940, 1991 WL 81497 (framing issue as "whether a contracting officer's direction to the contractor to correct or replace *previously accepted contract work*

---

**4.** The FAR's other two categories, also derived from the definition of "claim," are "payment of

money in a sum certain" and "the adjustment or interpretation of contract terms." *Id.* at 749.

\* \* \* is a 'claim by the government against a contractor' \* \* \*.") (emphasis added).

Moreover, *General Electric* was decided by a divided Senior Deciding Group of the ASBCA and affirmed by a divided panel of the Federal Circuit. The divided nature of the tribunals is noteworthy because the fundamental question faced by the courts in *General Electric* was where to locate the contracting officer's post-acceptance directives along the line between contract administration and appealable claims. The closeness of the decisions and the often repeated concerns about contract administration indicate how close the directives were to crossing the line into contract administration. Instead, the Federal Circuit drew the line after acceptance of performance:

> The Board's decision noted an acute concern over the prospect of piecemeal litigation and premature involvement in contract administration. \* \* \* *See, e.g.,* R. Nash & J. Cibinic, *Nonmonetary Claims: One Small Step for Man,* 2 The Nash & Cibinic Rep. ¶ 61 (1988) ("Although we favor such a holding [extending *Malone* to cover other nonmonetary disputes] it is not without a down side. It would have the potential of increasing the likelihood of litigation *during* contract performance and we are not sure that this is such a good idea."). This case, however, does not raise such a specter. *Following performance under the contract,* the Navy revoked *final acceptance* and chose to pursue a nonmonetary form of relief under the contract. The Navy's choice of remedy, *after acceptance of performance,* should not dictate the viability of an appeal. In his concurrence below, Chairman Williams found that the Government's revocation of acceptance, "under the circumstances of these appeals ... exceed[s] the bounds of ordinary contract administration resulting in a Government claim under the FAR." This court agrees.

*Id.* at 751–52 (emphasis added).

In contrast to *General Electric,* the facts in this case do not "exceed the bounds of ordinary contract administration." *Cf. General Electric,* 91–2 BCA at 119,948 ("Will we also take jurisdiction when a contractor is directed to perform work under the changes clause?") (Gomez, J., dissenting). The plaintiff, by its own admission, has not finished the work, and the defendant has not accepted the work. The time for contract performance has not expired. These facts place this dispute on the side of contract administration. *General Electric,* limited to post-acceptance remedies used by the Government, has no application here.

In summation, every quarrel between a contractor and the Government does not give immediate rise to an appealable claim. This Court is reluctant to become embroiled in contract administration; it is the contractor's contractual duty to proceed with the work sought by the Government, even in the face of disagreement. The plaintiff here does not have the right to seek a declaratory judgment from this Court as to whether or not it must do the work. The contract requires that the contractor do the work that the contracting officer orders and seek an equitable adjustment/monetary claim from the contracting officer thereafter. Although the Federal Courts Administration Act of 1992 expands the Court's jurisdiction to cover "nonmonetary claims," the legislative history indicates that the Act is not an open-ended invitation to bring every disagreement occurring during contract performance to this Court. Moreover, such an interpretation would be inconsistent with this Court's history of prescribed limits to its jurisdiction. In short, the plaintiff has presented a premature "claim" that is properly within the bounds of contract administration. Therefore, this Court lacks the necessary jurisdiction in this case.

## CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss is granted, the plaintiff's motion for summary judgment is denied, and the plaintiffs' Complaint is to be dismissed. Each party is to bear its own costs.

The clerk of the court is directed to enter judgment accordingly.