**DCX, INC., Appellant,**

v.

**William J. PERRY, Secretary of Defense, Appellee.**

**No. 94–1385.**

United States Court of Appeals, Federal Circuit.

March 11, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined May 16, 1996.

Robert E. Cohen, Arlington, Virginia, argued, for appellant. With him on the brief was Steven R. Perles, P.C., Washington, DC.

Frances M. Toole, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and John W. Showalter, Assistant Director.

Before MAYER, MICHEL, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

DCX, Inc., appeals a decision of the Armed Services Board of Contract Appeals upholding the government's termination of a contract for default. We affirm.

I

On April 1, 1988, the Defense Logistics Agency awarded a contract to DCX for light sets to be used in medical tents. The contract required DCX to perform a series of tests on the first light set that DCX manufactured under the contract and to supply the government with a First Article Test Report. The test report was due on June 30, 1988, and delivery of the light sets was required to begin by July 18, 1988. The contract provided that if DCX failed to deliver the test report on time, it "shall be deemed to have failed to make delivery within the meaning of the Default clause of this contract."

Because it did not have the facilities to perform the first article tests, DCX subcontracted the testing to Ball Brothers Aerospace Systems. Under the subcontract, the tests were to begin on May 19. Ball, however, did not begin DCX's tests until June 17. On that date, DCX advised the government that the testing process would not be completed until July 11 and that the government therefore would not receive the First Article Test Report until July 12. DCX blamed Ball's delay on the government's Defense Priorities and Allocations System (DPAS), which it asserted required Ball to postpone the DCX tests in favor of higher priority government contracts. On July 1, the day after the test report was due under the contract, the contracting officer advised DCX that it was in default, but she agreed to forbear termination until July 12, thus effectively granting DCX the additional time requested in its June 17 letter. When DCX failed to deliver the test report on the extended due date, however, the contracting officer referred the contract to the termination contracting officer who terminated the contract for default.

DCX appealed to the Armed Services Board of Contract Appeals, alleging that its failure to deliver the First Article Test Report was excusable because it was caused by the operation of the DPAS, and that the termination contracting officer had acted arbitrarily and capriciously in terminating the contract. DCX asked that the termination for default be converted into a termination for the convenience of the government.

The Board upheld the termination for default, finding that the delay was the fault of DCX and its subcontractor, Ball. The Board focused in particular on DCX's failure to guarantee timely performance by obtaining either a backup subcontractor or a binding time commitment from Ball to complete the tests by a date certain. With respect to DCX's proffered excuse for its failure to produce the test report by the extended deadline, the Board concluded that there was insufficient evidence that the operation of the DPAS caused the delay. The Board further found that the termination contracting officer adhered to the contract terms and the applicable procurement regulations, and that his termination decision was thus not arbitrary or capricious.

## II

On appeal, DCX makes three arguments: that the operation of the DPAS, not the negligence of DCX or its subcontractor, caused the delay in the delivery of the First Article Test Report; that the contracting officer abused his discretion when he terminated the contract for default; and that the Board's decision was tainted by fraud committed by the government's attorneys.

## A

■ The Board found that the government met its burden of proving that DCX did not perform in a timely fashion, and that DCX failed to meet its burden of proving that its nonperformance was excusable. *See Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 764 (Fed.Cir.1987); *Switlik Parachute Co. v. United States,* 216 Ct.Cl. 362, 573 F.2d 1228, 1234 (1978). DCX contends that the evidence conclusively showed that its failure to submit the First Article Test Report in a timely fashion was not attributable to any fault of DCX or Ball, but was caused by the government through the operation of the DPAS regulations, which require contractors to give precedence to higher priority government contracts. After reviewing the record, we agree with the Board that DCX failed to meet its burden of showing that the DPAS regulations excused its failure to fulfill the testing requirements of the contract.

The default clause in the contract excused any default caused by certain enumerated actions, including "acts of the Government." The default clause added, however, that "the failure to perform must be beyond the control and without the fault or negligence of the Contractor" or (in the case of a subcontract) "beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either." Although the operation of the DPAS may give rise to excusable delay in an appropriate case, the DPAS regulations require performance of a lower priority contract to be deferred only if "required delivery dates [for the higher rated contract] cannot otherwise be met." 15 C.F.R. § 700.14(a). As the Board pointed out, DCX's witness, who admitted having only limited acquaintance with the government contract priority system, testified that Ball deferred DCX's tests in favor of higher priority government contracts, but he did not testify that the displacement of DCX's tests was necessary in order to meet the required delivery dates of the higher priority contracts.

Moreover, as the Board noted, DCX did not take steps to protect against the possibility of delay in the testing process. DCX did not obtain its subcontract with Ball until May 11, 1988, some six weeks after the award of the contract to DCX, and the subcontract with Ball contained no firm commitment as to the date on which the testing would be completed. In addition, the Board pointed out, DCX "had no backup arrangements or commitments from any other party, that were available, to perform the tests needed in the event Ball delayed or for any reason was unable to meet DCX's time of delivery requirements." The Board was thus warranted in finding that DCX's failure to perform was attributable to its own negligence and that of its subcontractor, rather than to the operation of the DPAS.

## B

■ DCX next argues that the termination contracting officer acted arbitrarily and capriciously in terminating the DCX contract for default because he failed to follow

certain provisions of the Federal Acquisition Regulation before he terminated the contract. The Board found that the termination contracting officer adhered to both the terms of the contract and the requirements of the applicable procedural regulations. Once again, we uphold the Board's findings as supported by the evidence before it.

The first regulatory provision that DCX complains was not followed is 48 C.F.R. § 49.402–3(a), which requires the contracting officer to obtain legal review before terminating a contract. The termination contracting officer testified that he obtained the required legal review before terminating the contract, although he was not able to state with certainty which attorney reviewed the proposed termination action. DCX argues that the termination contracting officer's testimony was incredible, but that contention is baseless. The witness was firm in asserting that a legal review was conducted, and in light of the large number of contracts he handled over a several-year period, it is hardly surprising that he could not recall all the details of the legal review.

■ The second regulatory provision on which DCX relies, 48 C.F.R. § 49.402–3(f), requires a contracting officer to consider various factors before exercising his discretion to terminate a contract when the contractor is in default. In this case, the termination contracting officer's contemporaneous memorandum and hearing testimony demonstrate that he addressed the pertinent regulatory factors and found that they did not counsel against termination under the circumstances of this case. Moreover, the factors in section 49.402–3(f) that contracting officers are directed to consider before terminating contracts are not prerequisites to a valid termination. Although compliance or noncompliance with section 49.402–3(f) may aid a Board of Contract Appeals or a court in determining whether a contracting officer has abused his discretion in terminating a contract for default, *see Darwin Constr. Co. v. United States,* 811 F.2d 593, 598 (Fed.Cir. 1987); *Fairfield Scientific Corp. v. United States,* 222 Ct.Cl. 167, 611 F.2d 854, 862 (1979), the regulation does not confer rights on a defaulting contractor. A contracting

officer's failure to consider one or more of the section 49.402–3(f) factors therefore does not require that a default termination be converted into a termination for the convenience of the government. The Boards of Contract Appeals have embraced that view in a number of cases, and we agree. *See, e.g., William A. Hulett,* 93–1 B.C.A. (CCH) ¶ 25,389, at 126,459 (1992); *National Medical Staffing, Inc.,* 92–2 B.C.A. (CCH) ¶ 24,-837, at 123,918–19 (1992); *Metroplex Indus. Constructors, Inc.,* 89–3 B.C.A. (CCH) ¶ 22,-174, at 111,574 (1989); *Lafayette Coal Co.,* 89–3 B.C.A. (CCH) ¶ 21,963, at 110,482 (1989); *Douglas County Aviation, Inc.,* 85–3 B.C.A. (CCH) ¶ 18,257, at 91,655 (1985); *Spectrum Leasing Corp.,* 85–1 B.C.A. (CCH) ¶ 17,822, at 89,199 (1984); *International Elecs. Corp.,* 76–1 B.C.A. (CCH) ¶ 11,817, at 56,430 (1976).

DCX argues that the termination contracting officer acted rashly by terminating the contract on July 13 without considering the reasons for the delay. As the officer testified, however, the government had already given DCX an extension of time within which to produce the First Article Test Report. The contracting officer agreed to forbear termination until July 12, as requested by DCX. When July 13 arrived, the contracting officer had not received either the report or a request for a further extension of time. Having been given no explanation for the further delay, the termination contracting officer was not required to assume that DCX had a valid excuse for the further delay or to seek out further information about the status of the DCX's efforts. We therefore find nothing in the record to persuade us that the termination contracting officer acted arbitrarily or capriciously in terminating the contract when he did.

### C

■ DCX's final argument is that the attorneys for the government who presented this case to the Board committed fraud on the Board and that the Board's decision should be overturned on that ground. The allegations are of the most serious sort, charging the government attorneys with "submitting tampered evidence" and "collab-

orating with their witness to present false testimony." Yet the charges, which occupy a substantial portion of DCX's brief on appeal, were raised only obliquely before the Board. Although it is questionable whether DCX's passing reference to the challenged conduct in the brief it submitted to the Board was sufficient to preserve the fraud issue for our review, we have nonetheless examined the charges in light of the seriousness of the allegations.

Upon examination, we find the charges of fraud to be unsubstantiated. The charges are based primarily on a discrepancy between two copies of the memorandum prepared by the termination contracting officer on the day of the termination. The memorandum contains a signature line for the termination contracting officer and a signature line for the reviewing attorney. On the copy of the memorandum in the exhibit file, the termination contracting officer's signature is present, but the attorney's signature line is blank. On another copy of the memorandum located by appellant's counsel, however, both signature lines are completed. Appellant's counsel infer from the discrepancy between the two copies of the memorandum that the attorney's signature was "redacted" from the unsigned copy of the document in the exhibit file as part of a "scheme" to deceive the Board.

The need for deceit, according to DCX, arose from the fact that the attorney who signed the memorandum was out of town on the day of the termination and thus could not have signed the termination memorandum before the termination was effected. The evidence at the hearing, however, shows that there was no reason for the government attorneys to tamper with the evidence or otherwise seek to deceive the Board. The termination contracting officer did not testify that the attorney signed the memorandum before the termination, nor was there any legal requirement that he do so. In fact, the termination contracting officer testified that he believed that it was another attorney—not the one who signed the memorandum—who conducted the pre-termination legal review. Moreover, the termination contracting officer testified that he retained a "dummy file" of

his terminations, which suggests the entirely plausible (and innocent) explanation that the absent attorney at some later point signed one copy of the termination memorandum but not the other. The attorney who signed the memorandum was present at the hearing; counsel for appellant could have pursued the matter by questioning him, but chose not to do so. The "unsigned document" evidence thus provides no support for appellant's charge of fraud.

The other evidence that counsel point to in support of the fraud charge is a line of testimony by the termination contracting officer that appellant's counsel characterize as "evasive." While the witness was unable to recall certain details about the day that he terminated the DCX contract, we do not agree with appellant's characterization of the testimony as "evasive." Nor have we found anything in the testimony or other evidence at the hearing to support the charge that the witness committed perjury and that the government lawyers were aware of the perjury but failed to call it to the Board's attention. The charges of fraud therefore provide no basis for upsetting the Board's decision; indeed, we regard it as irresponsible for counsel to make such accusations while lacking a substantial basis to support them.

*AFFIRMED.*