Hilton LASSITER, d/b/a H. Lassiter Transport, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 01–602C.

United States Court of Federal Claims.

April 8, 2004.

Jeffrey J. Wood, Thomas and Associates, Harrisburg, PA, for plaintiff.

Michael Francis Kiely, Commercial and Appellate Litigation, Law Department, United States Postal Service, Washington, D.C., and Jason D. Marsh, Commercial and Appellate Litigation, Law Department, United States Postal Service, Washington, D.C., for defendant.

## OPINION

MARGOLIS, Senior Judge.

This case is before the Court on defendant's Motion for Summary Judgment, pursuant to R. CT. FED. CL. 56 ("RCFC"). Plaintiff filed a complaint alleging three causes of action, appeal from final decision of a contracting officer, breach of contract, and

due process violation.[1] Defendant moves for summary judgment, claiming that the default termination of plaintiff's contract was proper because plaintiff failed to perform contract services. Furthermore, defendant seeks compensation for its reprocurement costs. After careful consideration of both parties' briefs and oral argument, defendant's motion for summary judgment is GRANTED.

### FACTS

On December 17, 1999, defendant, the United States, acting through the United States Postal Service ("USPS"), awarded plaintiff, Hilton Lassiter, d/b/a H. Lassiter Transport ("Lassiter"), · contract number 170M5 ("contract") to provide mail transportation services between postal facilities. The contract began January 1, 2000, and was scheduled to end on June 30, 2003, with an annual rate of $49,655.65. On January 1, 2000, the parties amended the contract to reflect an increase in the annual rate to $51,486.05. The contract required transportation services for two trips each day between postal facilities in Harrisburg and Bloomsburg, Pennsylvania, with stops in Danville and Catawissa, Pennsylvania. The contract permitted the contractor to either perform services personally, or through a hired driver. Both plaintiff and an alternate driver, Thomas Strawbridge, performed the transportation services.

On or about June 16, 2000, the transportation supervisor in Harrisburg, Pennsylvania, contacted plaintiff to discuss an article published in the *Patriot–News*, a local Harrisburg newspaper. Compl. at 2. The newspaper article reported on criminal charges brought against plaintiff in relation to an automobile accident. *Id.* Specifically, the article noted that the police had charged defendant with: 1) accidents involving death or personal injury while not properly licensed, 2) homicide by vehicle, 3) involuntary manslaughter, 4) driving while operating privilege is suspended or revoked, 5) careless driving, and 6) speeding. The article also stated that plaintiff had obtained his commercial license in Pennsylvania by misrepre-

senting his North Carolina license. In light of the allegations contained in the newspaper article, the USPS informed plaintiff that he was prohibited from *personally* providing transportation services under the contract until he provided evidence of a valid driver's license. Defendant then instructed plaintiff to return the keys that provided access to the vestibules at the Postal Service locations. To continue providing service under the contract, plaintiff identified Thomas Strawbridge and Corey Anderson as replacement drivers. The USPS then gave the keys to plaintiff's alternate driver, Thomas Strawbridge. Corey Anderson borrowed the keys on the days that he transported the mail.

Plaintiff immediately obtained a copy of his Pennsylvania Ten–Year Driving Record from the Pennsylvania Department of Transportation Bureau of Driver Licensing and delivered it to the USPS on June 16, 2000. The record did not, however, convince the USPS of the validity of plaintiff's Pennsylvania license. Defendant requested additional evidence demonstrating that plaintiff had not obtained his current Pennsylvania license by misrepresenting the status of his North Carolina license. In essence, the USPS sought enough information to disprove the allegations that the commercial license was invalid. Thereafter, the USPS contacted the U.S. Postal Inspection Service ("Inspection Service") and asked the Inspection Service to contact the Dauphin County District Attorney's Office so that the USPS could verify the charges contained in the newspaper article. In an effort to comply with the USPS's orders, plaintiff attempted to obtain a copy of his North Carolina driving record. After several unsuccessful attempts by telephone, on June 23, 2000, plaintiff drove to North Carolina and personally obtained a copy of his North Carolina driving record. On June 26, 2000, plaintiff presented the North Carolina driving record to the transportation supervisor. Plaintiff provided his attorney with a copy of the North Carolina record, but did not furnish the contracting officer with a copy until July 14, 2000.

---

1. In their Joint Preliminary Status Report, filed March 29, 2002, the parties agreed that this Court lacks jurisdiction over the due process claim.

On or prior to June 29, 2000, plaintiff's replacement driver, Thomas Strawbridge, informed the USPS that he would only be able to deliver services under the contract for a few more days. Corey Anderson, plaintiff's other replacement driver, could not continue to provide transportation services due to his other employment. Plaintiff informed the USPS that he could not provide a replacement driver until July 5, 2000. Consequently, on June 30, 2000, the USPS ran one of plaintiff's daily trips for him. The USPS could not perform the second trip on June 30, 2000 because it did not have the manpower to do so. As a result, the USPS contacted five potential offerors to perform plaintiff's transportation services beginning with Trip 2 on June 30, 2000. The USPS received one offer from Wade Yocum, at an annual rate of $179,851. The offer covered the same number of miles and hours as plaintiff's original contract. Thereafter, the USPS awarded an emergency contract in the amount of $179,851 to Wade Yocum, d/b/a Yocum & Son Trucking, to provide the same transportation services required under plaintiff's contract beginning with the second trip on June 30, 2000.

On July 12, 2000, the Inspection Service informed defendant that the Dauphin County District Attorney's Office confirmed that plaintiff had been charged with the offenses listed in the newspaper article. Furthermore, after reviewing plaintiff's driving records from North Carolina and Pennsylvania, the contracting officer determined that the documents did not provide sufficient proof that plaintiff did not obtain his Pennsylvania driver's license by misrepresenting his North Carolina license.[2] Specifically, upon reviewing the North Carolina record, the contracting officer determined that there was a gap in the records between the period that Lassiter's North Carolina license was valid and the date the Pennsylvania record listed as the issuance of his Pennsylvania license.

On July 19, 2000, the contracting officer issued a final decision, terminating the contract for default, based on plaintiff's failure to provide service beginning on June 30, 2000. On October 13, 2000, defendant terminated the emergency contract and replaced it with HCR #170M9. On October 17, 2000, defendant issued a second final decision, assessing damages in the amount of $33,842.20. The damages represent defendant's reprocurement costs, including transportation costs, administrative costs, and costs incurred by USPS personnel while performing plaintiff's first trip on June 30, 2000. On or about February 5, 2001, plaintiff entered into a plea agreement where he pleaded guilty to homicide by vehicle, careless driving, and driving at unsafe speed. The district attorney's office withdrew the remaining charges. Thereafter, plaintiff's Pennsylvania license was suspended effective May 25, 2001.

Plaintiff filed suit in this Court on October 17, 2001, alleging that the contracting officer improperly assessed damages against him for failure to perform services under the contract. Plaintiff claims that his alleged failure to perform was the direct result of defendant's refusal to accept his Pennsylvania and North Carolina driving records as proof of valid licensure. In addition, plaintiff contends that defendant's refusal to accept his driving records was a material breach of the contract. Moreover, plaintiff claims that this breach of contract caused plaintiff to lose $154,458.15 in wages under the contract from June 30, 2000 to June 30, 2003. Plaintiff also contends that this breach caused him to suffer "consequential damages" because of his inability to "make lease payments on equipment used to perform under the Contract, ... [or] pay taxes, child support, and other bills." Pl.'s Compl. at 5.

Defendant filed its answer and counterclaim on December 17, 2001. Defendant asserts several affirmative defenses, including lack of jurisdiction over plaintiff's claim for damages because plaintiff failed to submit a claim to the contracting officer. Furthermore, defendant contends that plaintiff's recovery, if any, is limited to the liquidated damages specified in the damages clause of the contract. In addition, defendant counter-

---

2. Plaintiff did not provide the USPS with a copy of his application for his Pennsylvania driver's license.

claimed for its excess reprocurement costs. Defendant now moves for summary judgment, alleging that: 1) plaintiff defaulted on his contract; 2) the default was not excusable; and 3) plaintiff is liable for defendant's excess reprocurement costs.

## DISCUSSION

### I. Default Termination

■ The contract at issue contains a Termination for Default clause, which permits the contracting officer to terminate the contract for default if the contractor fails "to perform service according to the terms of the contract." Defendant's Appendix ("App.") at 10. It is well established that "default-termination is a 'drastic sanction,' which should be imposed (or sustained) only for good grounds and on 'solid evidence.'" *CJP Contractors, Inc. v. United States,* 45 Fed.Cl. 343, 371 (1999) (citing *J.D. Hedin Constr. Co. v. United States,* 187 Ct.Cl. 45, 57, 408 F.2d 424 (1969)). The government bears the burden of proof on the issue of whether it correctly terminated a contract for default. *CJP Contractors,* 45 Fed.Cl. at 371. *See also Amertex Enterprises, Ltd. v. United States,* 1995 WL 925961, *71 (Fed.Cl.1995); *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 764 (Fed.Cir.1987). Once the government meets its burden, the burden shifts to the contractor to demonstrate that its nonperformance was excusable. *DCX, Inc. v. Perry,* 79 F.3d 132, 134 (Fed.Cir.1996).

In this case, it is undisputed that plaintiff failed to perform transportation services under the contract. On June 29, 2000, plaintiff's replacement drivers indicated that they would no longer be able to provide transportation services for plaintiff. Plaintiff then indicated that he could not provide another driver until July 5, 2000, which forced the USPS and the emergency contractor to complete the services beginning on June 30, 2000. Plaintiff's "failure to perform service according to the terms of the contract" is an express event of default under the Termination for Default clause in the contract. The government, therefore, has demonstrated that plaintiff defaulted on his contract.

### II. Excuses for Nonperformance

■ Because the defendant satisfied its burden of proof, plaintiff is required to demonstrate that his nonperformance was excusable. *See DCX, Inc.,* 79 F.3d at 134. Plaintiff contends that the USPS precluded him from performing under the contract when it refused to accept his driving records as proof of valid licensure. Plaintiff claims, therefore, that the government is responsible for his inability to perform the transportation services under the contract. The Court rejects these arguments for several reasons.

First, the contract supports the USPS's decision to preclude Lassiter from transporting mail until he provided proof of a valid license. According to the terms of the contract, "drivers must be properly licensed to operate the vehicles." App. at 6. After reading the newspaper article containing information about plaintiff's criminal charges, the USPS had reason to suspect that plaintiff was not properly licensed while performing under the contract. Therefore, the decision to preclude plaintiff from personally performing the contracts, was consistent with the express terms of the contract.

In addition, the decision to preclude plaintiff from transporting the mail was required by the USPS's Management Instruction, one of the agency's regulations. *See* 39 C.F.R. 211.2(a)(3). According to the USPS Management Instruction titled "Screening Mailhandling Contract Employees," the USPS is required to screen transportation contractors to "determine their eligibility for access to the mails and mail processing facilities." App. at 18, I.A. The Management Instruction states that the contracting officer is responsible for making this determination. *Id.* at II.B. The Management Instruction also prohibits various persons from providing services under the contract. *Id.* at II.C. In particular, the Management Instruction states that "[p]ersons whose driving record reflects offenses or patterns outlined in the attachment titled 'Table of Driver Disqualifications'" are not eligible to provide services under the contract. *Id.* The "Table of Driver Disqualifications" lists as a "general disqualifying" factor, any "applicant [who] has a pending proceeding for suspension of driver's

license or has had license suspended within the last three years." App. at 19. This instruction clearly precludes plaintiff from personally providing transportation services under the contract. The district attorney charged plaintiff with driving while operating privilege is suspended or revoked, in violation of 75 Pa.C.S.A. § 1543. Moreover, the district attorney charged plaintiff with homicide by vehicle, in violation of 75 Pa.C.S.A. § 3732, and accidents involving death or personal injury while not properly licensed, in violation of 75 Pa.C.S.A. § 3742.1. 75 Pa. C.S.A. § 1532 requires a mandatory suspension of operating privileges for one year for accidents involving death or personal injury while not properly licensed, and a mandatory three-year suspension of operating privileges for homicide by vehicle. Because plaintiff was allegedly driving with a suspended license *and* subject to a pending proceeding for suspension of a driver's license, he was rightfully precluded from providing transportation services until he could provide proof of a valid driver's license.

Although the USPS barred plaintiff from driving before it verified the charges in the newspaper, its decision was reasonable and legally sound. In *Hines v. United States*, 60 F.3d 1442, 1449 (9th Cir.1995), the Ninth Circuit[3] found that the Management Instruction imposes "a duty on the Postal Service to screen drivers."[4] Consequently, once the USPS learned about the charges contained in the newspaper article, it was put on notice that plaintiff was potentially disqualified from driving under the express terms of the contract *and* the Management Instruction. The agency could not ignore this information, continue to allow plaintiff to drive, and risk violating its own regulations. In order to comply with its own mandatory regulations, the USPS was required to suspend plaintiff's driving privileges until it could investigate the charges.

Plaintiff also contends that his nonperformance was excusable because the USPS refused to accept his Pennsylvania and North

Carolina driving records as proof of valid licensure. Here, the USPS properly refused to accept the particular records as *sufficient* proof of valid licensure. The newspaper article stated that plaintiff was charged with driving while his operating privilege was suspended. Specifically, plaintiff was charged with obtaining à Pennsylvania license by misrepresenting his North Carolina license. In order to prove that plaintiff's Pennsylvania license was valid, plaintiff should have *at least* provided the USPS with a copy of his Pennsylvania license *application*. Plaintiff did not do so. Instead, he offered only his driving records from the two states. The USPS rightfully refused to accept these documents as proof for several reasons. First, the Pennsylvania record alone neither addressed the validity of his North Carolina license, nor the allegation that he obtained Pennsylvania license by misrepresenting his North Carolina license. Second, the North Carolina driving record failed to provide sufficient proof of valid licensure because, upon reviewing the North Carolina record, the contracting officer determined that there was a gap in the records between the period when Lassiter's North Carolina license was valid and the date the Pennsylvania record listed as the issuance of his Pennsylvania license. Accordingly, the contracting officer reasonably determined that the records did not sufficiently refute the allegations contained in the article.

In addition, plaintiff's disagreement with the USPS over the sufficiency of his proof did not excuse his nonperformance. The contract contains a Claims and Disputes clause which provides that "all disputes arising under or relating to this contract must be resolved under this clause." App. at 8. The clause requires contractors to "proceed diligently with performance of [the] contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the contracting officer." *Id.* at 9. As explained in *Valley View Enterprises, Inc. v.*

---

**3.** Although the Ninth Circuit's decision is not binding on this Court, the Court finds the reasoning to be persuasive.

**4.** Specifically, the court found that under California law, the instruction imposes a duty on the Postal Service to screen its drivers. *Hines*, 60 F.3d at 1449.

*United States,* "[t]he purpose of the covenant is to prevent an interruption of the work and a consequent loss or detriment to the government while the administrative proceedings are in progress." 35 Fed.Cl. 378, 383 (1996) (citing *Schmid v. United States,* 173 Ct.Cl. 302, 351 F.2d 651, 655 (1965)). Here, the Disputes clause required plaintiff to continue performance, pursuant to the contracting officer's order, pending an administrative appeal. *See Schmid,* 351 F.2d at 655. Additionally, if plaintiff believed that the USPS's instructions were beyond the scope of the contract, he was still required to continue performance pending final resolution of any request for relief. *See Valley View,* 35 Fed. Cl. at 383 ("The proper course for the contractor, if it believes it is being asked to do work beyond that called for by the contract, is to file a claim for an equitable adjustment, typically under the Changes clause, with the contracting officer.").

Plaintiff contends that he would have continued performance and was ready, willing and able to perform transportation services. He maintains, however, that he was precluded and prevented from doing so by reason of defendant instructing plaintiff to cease and desist transportation services. The Court rejects this argument. Although it is true that the USPS prevented plaintiff from personally providing services, it did not prevent plaintiff from utilizing replacement drivers to perform the contract. As the contractor, plaintiff was required to continue performance under the contract and provide replacement drivers when necessary. *See Appeal of Copman,* PSBCA No. 4889, 2002 WL 32254628 (Dec. 26, 2002) (upholding termination for default because it was contractor's "responsibility to assure performance of the route, even if she had entrusted performance to others, and maintaining available backup drivers, if needed"); *Appeal of Kemcorp,* PSBCA No. 4454, 2000–2 BCA, ¶ 31,146, 2000 WL 1643913 (Nov. 1, 2000) ("Appellant was responsible for providing dependable drivers or having back ups when necessary and for assuring that the service was performed according to the requirements of the contract."); *Appeal of Jerome Bailey,* PSBCA No. 3638, 95–1 BCA ¶ 27,447, 1994 WL 744643 (Dec. 21, 1994) (noting that despite contractor's inability to personally transport the mail, "the contract required Appellant to ensure that the contract was performed."). Although plaintiff initially provided substitute drivers, he stopped doing so on June 30, 2000. Because the contract required plaintiff to continue providing services (either personally or through a replacement driver), plaintiff's nonperformance was not excusable.

## III. Defendant's Damages for Excess Reprocurement Costs

 Defendant maintains that it is entitled to damages for its excess reprocurement costs incurred while performing plaintiff's contract services beginning on June 30, 2000. The Termination for Default clause of the contract provides that if the USPS terminates the contract, "it may acquire similar supplies or services or complete the work, and the supplier will be liable to the Postal Service for any excess costs." App. at 10. The government "bears the initial burden of demonstrating that it acted reasonably and in accordance with the procedures set out in the contract for calculating damages." *Seaboard Lumber Co. v. United States,* 48 Fed. Cl. 814, 819 (2001). "Whether the contracting officer acted reasonably, under the circumstances of a particular reprocurement, is a question of fact." *Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 484 (1993). In order to prove that its reprocurement costs are reasonable, the government must demonstrate the following factual conditions: "(1) the reprocured [services] are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs resulting from the default." *Cascade Pacific Int'l v. United States,* 773 F.2d 287, 294 (Fed.Cir. 1985).

Although this damages determination is generally reserved for trial, in the instant case, this Court can dispose of the matter on summary judgment. Defendant introduced substantial evidence to support the reasonableness of the contracting officer's reprocurement. Plaintiff, however, has neither argued against nor even addressed the reasonableness of the reprocurement costs.

Plaintiff merely states that defendant is not entitled to excess reprocurement costs because "[p]laintiff was not in default . . . [and][d]efendant's right to terminate the contract is not clear and free from doubt, and thus must be presented and submitted to a reasonable jury for disposition." Pl.'s. Opp. at 6. Neither of these statements create a triable issue of material fact. Accordingly, this Court accepts the following facts as uncontroverted.

■ First, the reprocured services are similar to those required under plaintiff's contract. *See Cascade Pacific Int'l,* 773 F.2d at 294 (noting that the similarity between the services is "demonstrated by comparing the item reprocured with the item specified in the original contract."). Here, the USPS and the emergency contractor both performed the same services as those required under plaintiff's contract. The USPS performed plaintiff's first trip on June 30, 2000, and the emergency contractor performed plaintiff's remaining services beginning with trip two on June 30, 2000. In addition, the emergency contract covered the same postal services, the same annual miles, and the same annual hours. Second, the defendant actually incurred excess costs in its reprocurement of plaintiff's contract. The reprocured services cost the USPS $33,842.20. This amount includes: 1) $33,058.37 in transportation costs; 2) $353.68 in administrative costs; and 3) $430.15 in costs incurred by the USPS while performing services for plaintiff during the first trip on June 30, 2000.[5] Although the Postal Service incurred $33,842.20 in reprocurement costs, it may only recover $31,872.79 because the Postal Service satisfied $1,969.41 of the reprocurement costs through previously suspended funds under the contract. App. at 51.

Third, the USPS acted reasonably to minimize the excess costs resulting from the default. *Cascade Pacific Int'l,* 773 F.2d at 294 ("The third condition requires that the Government act within a reasonable time of the

default, use the most efficient method of reprocurement, obtain a reasonable price, and mitigate its losses.") (internal citations omitted). Because the USPS is required to provide "prompt, reliable, and efficient services to patrons in all areas," 39 U.S.C.A. § 101(a), the agency is permitted to "make arrangements on a temporary basis for the transportation of mail when, as determined by the Postal Service, an emergency arises." 39 U.S.C.A. § 5001. Furthermore, "[t]he abbreviated nature of the procurement process, as well as the limited duration of the emergency service contract can justify a higher price for the service than a contract for a longer duration that is obtained through the normal procurement process." *Appeal of M.D.R.-RIC,* PSBCA No. 4472, 2001–1 BCA ¶ 31,302, 2001 WL 185509 (February 13, 2001).

In this case, although the USPS awarded the emergency contract at a higher rate than plaintiff's contract, the urgent nature of the emergency contract justified the higher price. Furthermore, plaintiff has not offered any evidence to challenge the reasonableness of the procurement.[6] *See Jechura v. United States,* 9 Cl.Ct. 753, 754 (1986) ("mere unsupported assertions are insufficient to . . . prevent the award of a summary judgment."). Consequently, this Court finds that defendant acted reasonably to minimize its excess costs and is entitled to its excess reprocurement costs in the amount of $31,872.79.

### CONCLUSION

For the reasons stated above, the Court GRANTS defendant's motion for summary judgment and awards defendant $31,872.79 in excess reprocurement costs. The Clerk will dismiss the complaint and enter judgment for the defendant for $31,872.79. Costs for defendant.

---

5. The costs were calculated by dividing the difference between the annual rates for the emergency contract and plaintiff's contract, which is $128,364.95 (the cost of the emergency contract), divided by 365 days. The difference between the daily rates totals $351.68 per day. The USPS

charged plaintiff for 94 days of the emergency contract at the daily rate.

6. Moreover, at oral argument, plaintiff specifically stated that it did not contest the reprocurement costs. Transcript at 18, lines 11–22.