ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| MIC/CCS, Joint Venture | ) | ASBCA No. 58242 |
| | ) | |
| Under Contract No. F42650-03-D-0010 | ) | |

APPEARANCES FOR THE APPELLANT:    Richard C. Johnson, Esq.
John S. Pachter, Esq.
  Smith Pachter McWhorter PLC
  Vienna, VA

Patrick Hendrickson, Esq.
  Hendrickson Law Firm
  South Jordan, UT

APPEARANCES FOR THE GOVERNMENT:    Col Robert J. Preston II, USAF
  Acting Air Force Chief Trial Attorney
Jeffrey M. Lowry, Esq.
  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE SCOTT
ON APPELLANT'S MOTION FOR SUMMARY JUDGMENT

MIC/CCS, Joint Venture (MIC/CCS) has appealed under the Contract Disputes
Act (CDA), 41 U.S.C. §§ 7101-7109, from the contracting officer's (CO's) termination
of Delivery Order (DO) No. 0383 under the subject contract for default. It moves for
summary judgment, converting the default termination to one for convenience, on the
basis that the government waived the DO's completion date and appellant was excusably
delayed through the termination date. The government opposes. At appellant's request,
the Board heard oral argument. For the reasons stated below we deny the motion.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION[1]

1. On 31 March 2003, pursuant to a Simplified Acquisition of Base Engineering
Requirements (SABER) solicitation, the Air Force awarded negotiated Contract
No. F42650-03-D-0010, a multiple award Indefinite Delivery, Indefinite Quantity section

---

[1]  Appellant presents additional proposed facts (PF) in its redacted 14 June 2013
    response to the Air Force's opposition to its motion for summary judgment (app.
    resp.). We have reviewed them but do not find them necessary to our resolution of
    the motion.

8(a) set-aside contract for design and construction services at Hill Air Force Base (AFB), Utah, and other sites, to MIC/CCS for a one-year base period with seven option years (R4, tab 1 at 1-6 of 33, Description of Work at 5).

2. The contract incorporates by reference or contains numerous Federal Acquisition Regulation (FAR) clauses, including the following:

FAR 52.211-12, LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000), which provides that if the contractor fails to complete the work in the time specified, it "shall pay liquidated damages to the Government in the amount of $162.00 for each calendar day of delay until the work is completed or accepted" (R4, tab 1 at 10 of 33).

FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (SEP 2002) (R4, tab 1 at 15), which provides in part that the government is to "make progress payments monthly as the work proceeds…on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the [CO]."

FAR 52.233-1, DISPUTES (JUL 2002)—ALTERNATE I (DEC 1991) (R4, tab 1 at 15 of 33), which provides in part:

> (i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the [CO].

FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) (R4, tab 1 at 15), which provides that the CO is to investigate promptly after receiving notice from the contractor of alleged differing site conditions and, if there are such conditions as defined in the clause, and they cause an increase in the contractor's cost of, or time to perform, the work, an equitable contract adjustment is to be made.

FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (R4, tab 1 at 15), which provides in part:

> (a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed…. The Contractor and its sureties shall be liable for any damage to

the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Government in completing the work.

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include—

....

(ii) Acts of the Government in either its sovereign or contractual capacity,

....

(c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

(d) The rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract.

<u>DO No. 0383</u>

3. In August 2010,[2] the Air Force issued a statement of work (SOW), as amended, for a project entitled "Re-Drill Well 7 and Repair/Reline Well 1" (R4, tab 4 at 1, 2, tab 6).

---

[2] Unless otherwise indicated, referenced dates are the dates of emails. Despite the August 2010 SOW issuance date, the SOW of record is dated 24 October 2012. We infer that this is because it was forwarded during this litigation through a 23 October 2012 email and, when the SOW document was opened, a software function changed its date to 24 October 2012.

3

Rodney Sanders was the Air Force's SABER project manager. Only items incorporated into the SOW from the contractor's accepted proposal were to be considered part of the SOW. The project involved construction of a replacement potable water well at Hill AFB, which required the contractor to drill a replacement well within 25 feet of an existing Well #7, using only reverse rotary drilling methods and qualified subcontractors experienced in those methods. The contractor was also to fill in and cap the existing Well #7 and to construct an addition to the existing well house to enclose the replacement well. Regarding Well #1, the contractor was to provide design specifications and to ensure that Well #1's water quality, after the relining and repair work, would meet Utah's primary and secondary drinking water standards and that the well would no longer produce sand in quantities that would damage pumping operations. The SOW also required the contractor to obtain an airfield waiver for its drilling rig and equipment due to the project's location on a flight path and to warrant the entire installation system for one year after project completion. (R4, tab 6 at SOW)

4. MIC/CCS forwarded a draft scope of work from its drilling subcontractor, Layne Christensen Company (Layne), to Mr. Sanders on 17 September 2010 (R4, tab 19). However, on 21 September 2010, MIC/CCS advised the Air Force that it had to decline submitting a proposal because the drilling proposals it had received did not comply with the government's SOW; the quotes were qualified with unit rates for work accomplished and unit pricing for delays, standby, etc.; none of the drillers were guaranteeing water quality; and all were providing daily rates for delays, unforeseen conditions, etc. (R4, tab 21). It added:

> In order for MIC/CCS to provide a proposal, the Government would need to agree to accept the conditions and qualifications in the subcontractor's proposal, plus markups to MIC/CCS for the various unit prices and daily rates in case of delays or differing site conditions. Basically this would change the project to a unit rate fixed price contract with a not-to-exceed amount with no guarantee of performance.

(R4, tab 22 at 3, tab 25)

5. Later on 21 September 2010 MIC/CCS informed the Air Force that it was willing to submit a proposal if the Air Force would acknowledge the subcontractor's conditions and qualifications and use the subcontractor's proposal documents instead of the government's SOW to perform the repairs and new well work and, for any additional items, MIC/CCS would provide additional costs and rates (R4, tab 22 at 1-2). It forwarded a copy of Layne's 21 September 2010 pricing proposal, which broke down the work on each well into numerous components, and gave unit pricing. The total price for Well #1 was $247,300 and, for Well #7, $988,504. Layne's pricing was subject to a Loss of Fluids clause providing that, if fluids loss were encountered due to hydrogeologic

4

conditions, Layne would be compensated at a $550 per hour plus cost and 20 percent markup for all drilling fluid materials and additives used during the loss of fluids period. The proposal assumed 24/7 drilling and that well design was subject to change based upon geophysical logs and sieve analysis. (R4, tab 22 at Layne 9/21/10 proposal)

6. Mr. Sanders responded on 21 September 2010 that, after discussing the project with Layne, and its drilling process, the Air Force was comfortable with MIC/CCS's proposal. He asked MIC/CCS to provide a proposal to CO Douglas Young. It submitted one dated 22 September 2010, which attached Layne's 21 September 2010 proposal and stated that it was based upon that proposal and not the government's SOW. (R4, tab 2 at 6-44, tab 22 at 1)

7. The Air Force awarded the DO to MIC/CCS on 22 September 2010 (R4, tab 2 at 1). It contained one contract line item, in the lump sum of $1,757,438, which stated:

> Redrill Well #7 & Repair/Reline Well #1
> FFP [Firm Fixed-Price]
> The purpose of this project is to redrill well #7 and repair and
> reline well #1 at Hill AFB. The work shall be done in
> accordance with the contractor's proposal dated 22 Sep 2010,
> and according to the terms and conditions of the basic
> contract.

(R4, tab 2 at 2) The completion period was 300 days after the issuance of the notice to proceed (*id.* at 4).

8. MIC/CCS's 22 September 2010 Proposal Summary, marked "**Preliminary Estimate**," stated:

> We propose to perform this project for the total price of ***One Million Seven Hundred Fifty Seven Thousand Four Hundred Thirty Eight Dollars and no Cents. ($1,757,438.00)*** Performance period is ***300*** calendar days.
>
> This proposal is based off of the Subcontractors provide[d] proposal and not the government provided SOW. Please see the attached proposal from [Layne].

(R4, tab 2 at 6)

9. Layne's incorporated 21 September 2010 proposal was similar to the one MIC/CCS had initially forwarded to the Air Force (SOF ¶ 5), but it stated that a "**maximum adder**" of $75,000 had been added to the price for any loss of fluid

5

situations; the hourly quantities were maximum billable quantities; once operational on site, if Layne were delayed by the government, the hourly rate would apply; and the "estimated total of all costs, including the (worst case) loss of fluids adder is $1,310,804.00" (R4, tab 2 at 9). Layne stated that it had teamed with Loughlin Water Associates, said to be a Utah well designer with local experience in managing well installation (*id.* at 7).

10. MIC/CCS's 21 September 2010 Scope of Work, marked "**Preliminary Estimate**," stated that it was conditional and qualified as follows:

- **MIC/CCS's proposal for the well #1 repairs and well # 7 drilling is based solely on the attached subcontractor scope [of] work, unit rates for work accomplished and unit pricing for delays, etc. plus MIC/CCS markups.**
- **No guarantee is stated, implied or offered concerning the production or quality of water from the wells.**
- **We cannot guarantee the new well#7 will produce water.**
- **If the well#1 or well #7 produces water, we cannot guarantee the quality of the water to meet any potable standards or for the well to produce water in the quantity or GPM [gallons per minute] assumed by the Government.**

(R4, tab 2 at 13) The Scope of Work stated for both Well #1 and Well #7 that MIC/CCS would provide all labor and materials in Layne's proposal "at the quoted unit prices, per foot prices, and LS pricing, plus MIC/CCS markups"; any additional work or requirements would be subject to additional costs, time, and down time delays; and MIC/CCS's proposal was in conjunction with Layne's proposal and incorporated all assumptions, exclusions, and "hourly pricing to perform work" (R4, tab 2 at 15).

11. For Well #1, Layne's proposal incorporated into the DO called for the contractor to furnish and install a 10" low carbon steel casing/stainless steel wire wrap screen liner, which Layne had stated in its 17 September 2010 proposed scope of work included gravel packing with an engineered filter pack to prevent sand production (R4, tab 2 at 7, 11). It was also to furnish and install a pumping system, assuming 500 gpm with 600' TDH (total dynamic head), and to perform a 10-hour step test and a 72-hour constant rate test. The proposal assumed 24/7 drilling. (*Id.* at 7-8)

12. Concerning Well #7, Layne's proposal incorporated into the DO, and the referenced subcontractor's scope of work, called for the contractor to drill a replacement well; perform a pilot boring; perform zone water sampling and water quality tests; drill and install surface casing; perform ream boring; provide and install a complete new

6

pumping system; perform a 10-hour step test and a 72-hour constant rate test; cap and fill and abandon the existing Well #7; and construct an addition to the existing well house to enclose the new well (R4, tab 2 at 8, 11-15).

13. The government's SOW was not incorporated into the DO and the contractor/subcontractor proposals incorporated in the DO did not specify a drilling method (R4, tab 2). Appellant contends, however, that it was understood that Well #7 would be drilled using the reverse rotary drilling method only, citing an internal Air Force email of 13 September 2013 to Mr. Sanders and others stating "[p]lease ensure we are not considering a cable tool job." Appellant alleges that "[t]he 'cable tool' drilling method is the most common alternative to the reverse rotary method." (R4, tab 14; app. mot. at 2, PF 4 n.4)

14. The Air Force issued the Notice to Proceed on 5 October 2010; work was to begin by 14 October 2010 and to be completed by 11 August 2011. Final inspection was to be seven days prior to the contract completion date. (R4, tab 32)

## Well #1 – Production of Sand

15. On 9 November 2010 MIC/CCS's project manager, Seth Dixon, notified Mr. Sanders that Layne was scheduled to begin working on Well #1 on 15 November 2010 (R4, tab 47).

16. On 10 December 2010 Layne informed MIC/CCS that it had finished installing the new well liner in Well #1 and that "the well is pumping virtually no sand" (R4, tab 54 at 2). However, on 13 December 2010, Mr. Sanders inquired of Mr. Dixon as to why the well was pumping sand. Mr. Dixon replied that the sand production had been within allowable limits before the gravel pack had settled; Layne had to add more gravel around the new liner; and Layne would pursue the sand issue. (R4, tab 54)

17. On 15 December 2010 the Air Force provided MIC/CCS with a temporary airfield waiver, from 14 December 2010 through 31 January 2011, for the Well #7 replacement, but Mr. Sanders informed Mr. Dixon that MIC/CCS would need to finish the work at Well #1 prior to relocating any equipment (R4, tab 58).

18. On 17 December 2010 Layne notified MIC/CCS that it had run its pump tests up to 500 gpm for the step and constant rate tests; it knew the well could produce more but felt that keeping the flow rate at about that number would help keep sand from being pulled into the well, which would happen at a higher flow rate (R4, tab 59). It recommended sizing the replacement equipment at the 500 gpm rate (*id.* at 5). MIC/CCS forwarded the recommendation to the Air Force, which responded that it would like to see a higher flow but could not determine that flow until it saw the results of a good pump test, and the well had previously produced 800 gpm. Mr. Dixon replied on

20 December 2010 that sand production after the installation of the new liner "was quite low compared to what the existing well was producing since we have around a 90% reduction in sand" (*id.* at 2-3); Layne's design and proposal had been based on a 500 gpm pump; the new liner made the existing well smaller; and the existing well was non-functional and had not produced water "due to large amounts of sand" (*id.* at 3). On 21 December 2010 MIC/CCS and Layne agreed to install the pump so as to produce 500 gpm of water at the storage tank rather than at the well (*id.* at 1-2).

19. On 25 January 2011, MIC/CCS submitted results from the second 24-hour pump test of Well #1 to Mr. Sanders, said to indicate about 500 gpm and low sand production in the last 12 hours of the test (R4, tab 61). However, on 9 March 2011 Mr. Dixon's internal email advised:

> The well liner we installed at well # 1 is letting a large amount of Silica sand through the screens or up from the bottom of the well. When we tested the well a week ago there was a large amount of silica sand show up [sic] in all of the lines as well as the sand separator. Because so much sand was getting into the system Layne pulled the pump back off of well 1 yesterday and we ran another video log again today.
>
> It appears from the video that most of the gravel pack at the upper screens is missing ([d]ue to the drop in sand at the lower screen) and the lower screens have sand coming in from the gravel pack. I spoke with Josh from Layne and he keeps going back to the design and everything they had designed should not allow sand to come in from the screens.
>
> ....
>
> It sounds like they want to get to the bottom of the issue and Layne has told me that they are going to keep working on the problem until it is solved.
>
> [I]t is quite confusing because we test pumped the well two times and each time they developed the well for 24 hours and by the end of the testing there was almost no sand production. (Josh thinks there has been a major failure in the lower end of the well like the cap popping loose or a break in the piping.)

(R4, tab 77) The memorandum listed potential reasons for the sand problem.

20. On 24 March 2011 Layne installed a patch in Well #1 to try to fix the sand problem (R4, tab 3-23).

21. Layne advised MIC/CCS on 1 April 2011 that, upon re-installation of a turbine pump, Well #1 was producing between 515 and 535 gpm; it did not feel it needed to be tested further; and the well and pump could be run at the Air Force's discretion. Layne was confident that sand would drop to trace amounts. On the same day, MIC/CCS forwarded the information to the government. (R4, tab 87 at 1-2)

22. Internal Air Force emails indicate that it attempted a 48-hour flow test of Well #1 on about 5 April 2011 and, within 24 hours, the well produced sand, including 2 1/2 gallons of gravel (R4, tab 91). MIC/CCS's and Layne's 22 April and 25 April, 2011 emails indicate that Well #1 had a hole or holes (R4, tab 99).

23. On 26 April 2011 Mr. Sanders questioned MIC/CCS about a "suspect hole 2":

> If the video comes back with some unknown source, then the government can't/won't hold the contractor responsible for any more repairs. With that being said, if there are holes/penetrations (i.e. bad weld, collapsed screen, etc) then the contractor(s) need to meet their contractual obligation and provide the fix.

(R4, tab 102)

24. The government does not dispute appellant's statement that:

> On May 25, 2011, the parties met to discuss the Well #1 situation, and although MIC/CCS informed the Air Force that it considered the work at Well #1 complete, MIC/CCS proposed possible reasons for the cause of the sand contamination. In addition, MIC/CCS offered possible actions, in excess of the [DO] requirements, to resolve the sand contamination problem....MIC/CCS offered no guaranty that these actions would be successful.

(App. mot. at 3, PF 8) The government adds that MIC/CCS proposed to perform its suggested actions "without additional charge" (R4, tab 123 at 4; gov't opp'n at 5, ¶ 8).

25. The CO's 25 May 2011 "MEMO TO FILE" concerning a meeting with MIC/CCS and Layne records that Layne stated there was a problem with holes developing in the well. The CO reported that the contractor wanted $50,000 to perform its proposed solution, otherwise it would consider Well #1 work complete. (R4, tab 119)

26. On 26 May 2011, the CO asserted to MIC/CCS that the contractor had not fulfilled its obligation under the DO (R4, tab 120).

27. It is undisputed that, on 31 May, 2011, MIC/CCS wrote to the Air Force confirming the matters discussed at the May 25 meeting, and offered to provide a $15,000 credit to mitigate the cost to install a variable frequency drive (VFD) on the pump (app. mot. at 4, PF 9; gov't opp'n at 5, ¶ 9). MIC/CCS reiterated that it considered Well #1 work complete and stated that its performance of various tasks at no additional cost was on the understanding that they were not required; this would satisfy any obligation the government believed MIC/CCS owed it under the contract; and MIC/CCS did not guarantee that Well #1 would produce water in any quantity or quality at the end of the additional work. (R4, tab 123 at 4)

28. The CO replied to MIC/CCS by memorandum of 9 June 2011 that it was not the government's role to "give direction or resolution in an area where you are the experts" (R4, tab 125 at 1); MIC/CCS was responsible for contract performance; and:

> [The government's] position in regards to Well #1 is that we awarded a [DO] to fix a well where we were getting no water. To have a well that produces water is the basic purpose of this [DO] and is what you proposed on. We agree that Potable Water is not an issue but water production is. Because of this issue, we cannot accept [MIC/CCS's] offer of 31 May 2011. Hill AFB...will install the VFD.

(*Id.*) The CO stated that the 72-hour constant rate test had not been performed on Well #1; DO performance had not been good; and it appeared that the contractor would not complete it by the 11 August 2011 due date (*id.* at 2).

29. By letter of 15 June 2011, MIC/CCS notified the government that it considered the "migration of sand/gravel pack" into Well #1 to be a differing site condition (R4, tab 126 at 4). It gave its plan for proceeding with the well work, asking the government to provide direction by 22 June 2011 if it did not agree (*id.*).

30. The CO informed MIC/CCS on 27 June 2011 that a differing site condition investigation regarding Well #1 was "still being conducted" pursuant to the Differing Site Conditions clause (R4, tab 129).

10

## Well #7 – Loss of Fluids

31. On 31 January 2011 Hill AFB issued an extension of the airfield waiver through 31 October 2011 for the Well #7 work (R4, tab 64 at 6). On 21 September 2011 Hill AFB extended the waiver through 30 April 2012 (gov't opp'n, ex. 1).

32. On 8 February 2011 MIC/CCS sought to abandon Well #7 prior to drilling the replacement well to protect against loss of fluid issues and running into the existing well. The government approved subject to the Utah State Engineer's approval. (R4, tab 69)

33. As of 15 February 2011, MIC/CCS was asking the Air Force to determine Well #7's location and it did so (app. mot. at 4, PF 11; gov't opp'n at 6, ¶ 11).

34. On 25 March 2011 Layne began to suffer fluid loss while drilling replacement Well #7 (R4, tab 3-24). On 31 March 2011 Layne informed MIC/CCS that it had reached the $75,000 limit under the Loss of Fluids clause. MIC/CCS advised the government that, thereafter, any loss of fluids would be at Layne's expense. (R4, tab 84)

35. By letter of 16 June 2011, MIC/CCS notified the CO that it had received notice of what Layne believed was a changed site condition during borehole reaming at Well #7; Layne had experienced "extreme losses of fluid circulation"; and Layne would suggest alternative drilling methods. MIC/CCS informed the CO that it would evaluate Layne's assertion and forward any information to the CO. (R4, tab 127)

36. On 1 July 2011, MIC/CCS forwarded to the CO a 28 June 2011 letter to MIC/CCS from Layne advising that it had not stopped work but that the magnitude of the loss of fluids had "rendered the specified method of construction ineffective" (R4, tab 130 at 2). Layne opined that to proceed would be economic waste and it was formulating optional methods that might be better for the conditions encountered. It added that the existing well had been abandoned per the specifications, state requirements, and industry standards but there continued to be communication between it and the new well that made the lost circulation condition even more severe. Layne concluded with a commitment to working with MIC/CCS to complete the project. (R4, tab 130)

37. The government does not dispute appellant's statement that:

> On July 6, 2011, [Layne] wrote to MIC/CCS outlining a proposed approach to the problems on Well #7, in advance of a meeting...with the Air Force on July 12. The letter outlined all of the steps [Layne] had already taken to attempt to solve the fluid loss situation at Well #7, and concluded that a new drilling method would have to be tried (the cable tool method). The letter outlined...19 steps that [Layne]

11

recommended as necessary and notified MIC/CCS that the subcontract price would increase to $2,399,920 from $1,235,804 because none of these steps were among those included in [Layne's proposal].

(App. mot. at 5, PF 17; gov't opp'n at 6, ¶ 17; *see* R4, tab 131) It is also undisputed that the Air Force, MIC/CCS, and Layne met on 12 July 2011 and discussed Layne's 6 July 2011 letter, and that a 12 July 2011 letter from Layne to MIC/CCS requested permission to use an "alternate drilling method" and an immediate response so it could begin work in the next few days (R4, tab 134 at 2; app. mot. at 5, PF 18-19; gov't opp'n at 6, ¶ 18-19). However, the government asserts that the DO did not specify a drilling method (gov't opp'n at 6, ¶ 19).

38. On 13 July 2011, Robert Newberry, said to be chief executive officer of Cadence Contract Services, LLC, a joint venture partner of MIC/CCS, and to have had "operational responsibilities for the Hill AFB SABER contract" (app. mot., Newberry aff. ¶¶ 4, 5), sent an email to the CO to confirm his understanding of the CO's alleged direction to him in a phone conversation following the 12 July 2011 meeting that:

> [N]o additional work should take place on Well Number 7 until the Government has reviewed the forthcoming claim concerning differing site conditions and/or impossibility/impracticability of performance issues.

(R4, tab 134 at 1) Mr. Newberry asked whether his understanding of the CO's "direction" was correct (*id.*). He referred to the 12 July 2011 letter from Layne to MIC/CCS (SOF ¶ 37), which had contended that it was "not feasible to continue" with the alleged specified drilling method (R4, tab 134 at 2). Appellant states that Layne's letter advised that it was stopping drilling pending resolution of the Well #7 issues and that work stopped on about 12 July 2011 due to the Air Force's inability to give direction (app. mot. at 12; app. resp. at 2). This was before the DO's initial 11 August 2011 completion date and its extended 26 September 2011 completion date (SOF ¶¶ 14, 42).

39. The CO responded to Mr. Newberry on 13 July 2011:

> As I understand your claim, it is for costs that you have allegedly incurred and for costs that you plan on incurring if the change is approved[;] the reason for the claim has yet to be revealed. I cannot authorize you to incur costs above the amount of the contract. That action would be a "Ratification" and would basically be like giving you a blank check....I am sure that [Layne] had that arrangement with the Argentine Government, but this is not a life and death situation. We

12

have made arrangements for water from Weber Basin
Conservancy District and are not in need, especially this year.
Please forward your claim at your earliest convenience.

(R4, tab 135 at 1)

40. It is undisputed that, on 14 July 2011, MIC/CCS advised the CO that "[i]t is our strong desire to resolve the issues and complete the Task Order. We stand ready to return to work as soon as the Government authorizes." (R4, tab 138; app. mot. at 6, PF 22; gov't opp'n at 7, ¶ 22)

41. By letter to the CO of 28 July 2011, MIC/CCS submitted a 26 July 2011 "Well #7 Change of Conditions Claim" from Layne and documentation (app. supp. R4, tab A-231 at 10636, -638). Layne sought an equitable adjustment of $374,076 for its alleged additional costs in addressing the loss of fluids conditions and $715,040 to implement the drilling method it had proposed. It asked that work be allowed to resume as soon as possible so that the well could be constructed as expeditiously as possible. Neither letter included a CDA certification, 41 U.S.C. § 7103(b).

Government's Differing Site Conditions Investigation and Contractor Actions

42. Effective 10 August 2011, the parties executed DO Modification No. 01, which extended the completion date to 26 September 2011 to allow for completion of a differing site conditions investigation (R4, tab 143 at 2-4).

43. On 22 September 2011 MIC/CCS inquired about the status of the government's differing site conditions investigation on Well #1 and Well #7, stating that it needed to plan how to handle idle equipment at the site as winter approached. The CO responded that day that he was still waiting for funds to pay for an independent analysis of the differing site conditions allegations. (R4, tab 148)

44. On 21 October 2011 MIC/CCS requested a meeting with the Air Force and forwarded a Layne invoice. MIC/CCS contended that it was ready and willing to proceed with the work "after we receive the requested direction from the Government"; the extended completion date had passed almost a month ago; and "we have not yet received the requested direction from the Government or a response to Layne's claim." (R4, tab 146 at 3) The invoice reflected the accrual of standby amounts beginning 10 August 2011 and continuing through 18 October 2011 in the amount of $756,000 (*id.* at 2). MIC/CCS requested a meeting to "ascertain the Government's direction" (*id.* at 3).

45. On 7 November 2011 a meeting occurred among the CO and other government personnel, MIC/CCS, and Layne (R4, tab 152).

13

46. By letter to the CO of 18 November 2011, MIC/CCS asserted that the DO had been completed to the extent practicable because further performance would increase costs without achieving well performance. To the extent that it was not complete, the government's failure to act on its differing site conditions notices constituted a constructive termination for convenience. In any case, the government owed MIC/CCS payment for the work it had performed. (R4, tab 154)

47. On 14 December 2011 MIC/CCS informed the CO that Layne had completed its demobilization at the Well #7 site (R4, tab 158).

48. On 15 December 2011, the CO responded to MIC/CCS's 18 November 2011 letter, denying that the work contracted for regarding Wells #1 and #7 had been completed and that any government actions or inactions constituted a constructive termination for convenience. He stated that an independent contractor, "Bowen Collins" (Bowen Collins & Associates, Inc.), was investigating the alleged differing site conditions; it was probable it would contact MIC/CCS; and, upon receipt of the report, the government would review it and provide a copy to MIC/CCS in anticipation of a meeting to discuss the report and resolution of the Wells #1 and #7 issues. (R4, tab 159)

49. MIC/CCS replied by letter of 16 December 2011 that the DO had been completed "*to the extent practicable*, given the circumstances that are beyond the control of MIC/CCS" and "[r]egardless of what the Government's Independent Contractor determines, the circumstances and conclusions we have reached will remain the same" (R4, tab 160 at 3-4). MIC/CCS sought payment of amounts allegedly owed under the DO so it could be concluded, with claim amounts to be resolved later, and submitted a progress payment invoice for $1,344,941 (*id.* at 4-5).

50. The CO replied by letter of 21 December 2011 that the government's position pending the outcome of its differing site conditions investigation was that "the terms and conditions of the contract have not been met" and that he therefore refused to sign MIC/CCS's invoice (R4, tab 161 at 4th page). He invited MIC/CCS to contact him anytime concerning the independent contractor's progress.

51. MIC/CCS submitted a certified claim to the CO by letter of 29 December 2011, seeking payment of its 16 December 2011 "Pre-Final" invoice (R4, tab 162).

52. Chris Mikell of Bowen Collins provided his report to the CO on 8 February 2012, stating he believed it "points everything back to Layne" (R4, tab 163 at 1). Regarding Well #1, he concluded that faulty materials or construction, specifically liner material or installation, caused the filter pack to enter the well. Concerning Well #7, he opined that there were no changed conditions and "[t]he difficult drilling conditions should have been well known to [Layne] as part of its due diligence to prepare a bid for the project" (*id.* at 3). The government does not dispute appellant's statement that:

14

[The report purported] to conclude that no differing site conditions had been encountered under the [DO]. The report made no mention of the applicable [DO] terms and conditions, matters of which Bowen Collins appeared to have no knowledge. The Air Force did not provide a copy of the...report to MIC/CCS until April 20, 2012, when it was included in the initial Rule 4 File under ASBCA No. 58023.

(App. mot at 9-10, PF 38 (citations omitted); gov't opp'n at 10, ¶ 38)

53. It is undisputed that, on 1 March 2012, the CO called Mr. Newberry and requested a meeting to discuss an amicable agreement, without legal representatives, on the ground that legal matters would not be discussed (app. mot. at 10, PF 40; gov't opp'n at 10, ¶ 40). The parties met on 5 March 2012 (*see* R4, tabs 165, 166).

54. On 6 March 2012, after requesting a proposal from MIC/CCS at the 5 March 2012 meeting, the CO directed it not to submit a proposal (app. mot. at 10, PF 41-43; gov't opp'n at 10-11, ¶¶ 41-43).

Termination for Default

55. On 6 March 2012 the CO issued a show cause notice to MIC/CCS stating that, because it had failed to perform the DO within the required time, the government was considering a default termination. The notice concluded:

> Please note that in accordance with contract clause 52.233-1, the contractor is required to proceed diligently with performance of the contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the [CO]. The contractor is not in compliance with this mandatory clause.

(R4, tab 168) The government does not dispute that the notice did not mention liquidated damages (app. mot. at 11, PF 44; gov't opp'n at 11, ¶ 44).

56. MIC/CCS responded by letter of 12 March 2012 (R4, tab 169) that the government had failed to respond to its differing site conditions allegations; any failure to perform was the government's; the DO had been completed to the extent practicable; whether the DO was deemed to be complete or should be terminated for convenience, the amounts owed to MIC/CCS were the same; MIC/CCS was "finished with our work under this [DO]" (*id.* at 15); and the government had no legitimate basis for its show cause

15

notice. It is undisputed that the government did not respond to appellant's letter (app. mot. at 11, PF 45; gov't opp'n at 11, ¶ 45).

57. CO David J. Clark's final decision of 18 June 2012 terminated the DO for default, due to MIC/CCS's alleged failure to complete the contracted work and to proceed diligently with contract performance pending review of its differing site conditions claim (R4, tab 170). The CO stated that MIC/CCS not only failed to repair and reline Well #1 pursuant to contract but it also damaged the existing well, and failed to complete Well #7 per contract requirements. The CO alleged that an independent study found that MIC/CCS's changed conditions claim lacked merit. He concluded that the government "has the right to seek a remedy, including, but not limited to any excess costs of reprocurement" (*id.* at 2). The notice did not contain the term "liquidated damages."

58. MIC/CCS filed the instant appeal on 18 July 2012.

59. It is undisputed that liquidated damages have not been assessed. The government contends that, until the contract work is complete, it does not know the extent of the liquidated damages (gov't opp'n at 11, ¶ 50).

## DISCUSSION

### The Parties' Contentions

Appellant alleges that, pursuant to *DeVito v. United States*, 413 F.2d 1147 (Ct. Cl. 1969), discussed below, the government waived the DO's completion date and appellant is entitled to summary judgment. Appellant recognizes that *DeVito* normally is applied to supply contracts, not construction contracts such as at issue here, but it contends that the relevant circumstances are extraordinary and satisfy exceptions to the norm. It asserts that the only material facts are those pertaining to the government's alleged waiver of the DO's original completion date and that those facts are undisputed.

Appellant contends that the government's statement that it did not have an immediate need for the wells; a five-month delay between the amended contract completion date and the show cause notice; and the government's failure to assess or mention liquidated damages, evidenced that time was not of the essence and waived the completion date. Appellant asserts that, once the government waived the DO's deadline, it could not terminate for default without establishing a new, reasonable, performance date.

The government counters that there are no unusual circumstances that would make *DeVito* applicable to the construction contract in question and, in any case, the Air Force's forbearance on assessing liquidated damages while it investigated appellant's differing site conditions claims was not tantamount to waiver of the DO's due date.

16

Waiver does not apply because appellant did not perform after the contract completion date, having stopped prior thereto and abandoned the worksite. Even when a contract delivery date has passed, a contractor's later abandonment of performance creates an independent right to terminate. Further, appellant did not demobilize because the Air Force prevented it from working; it demobilized because it disagreed with the Air Force about the appropriate performance method after it experienced difficulties and it was unwilling to perform unless the Air Force issued a change order. Moreover, appellant's entitlement under the Payments clause to progress payments for work performed after the contract due date removed the element of detriment necessary to establish waiver.

Appellant maintains that its demobilization in fact established its reliance upon the government's failure to terminate. It was not required to perform pending direction from the CO on its differing site conditions allegations and its proposal for alleviating sand conditions in Well #1. Appellant alleges that its default was excusable because the government breached its duty to provide direction. It adds that the government's claim that it had no more funds to assign to the contract breached its duty not to hinder performance and also caused excusable delay.

The government responds that any funding issues or government determination not to approve a contract change do not justify a contractor's repudiation of its contractual obligations and its abandonment of performance. Failure to proceed in accordance with the Disputes clause is a material breach, justifying termination without the need to establish a new completion date. The government also maintains that appellant's default was not excusable and it was not entitled to stop performance in the face of defective or "impossible" specifications when it conditioned its acceptance of the DO upon use of its own specifications.[3]

The government urges that summary judgment is not appropriate because appellant relies upon disputed material facts and, even if there were none, appellant has not established that it is entitled to judgment as a matter of law. At oral argument, the government asserted that there were numerous material facts in dispute, such as whether MIC/CCS took any action in reliance upon the Air Force's alleged delay in terminating the DO for default; whether MIC/CCS abandoned performance; whether the Air Force failed to give direction concerning the alleged differing site conditions or directed MIC/CCS to complete performance; and whether there was a differing site condition excusing appellant's delay and entitling it to additional time.

---

[3] Appellant states that its defective specifications claim is based, not upon its own specifications, but upon the government's specification that the new well had to be located within 25 feet of the existing Well #7 (app. redacted resp. at 18-19).

17

## Summary Judgment Standards

It is well-established that summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); *Bruce E. Zoeller*, ASBCA No. 56578, 13 BCA ¶ 35,353 at 173,517, *recon. denied*, 14-1 BCA ¶ 35,480. A disputed fact is material only if it might affect the outcome of the case. *Delta Industries, Inc.*, ASBCA No. 57356, 12-1 BCA ¶ 34,959 at 171,860. There is a genuine issue of material fact that will bar summary judgment if a reasonable fact-finder could find in favor of the nonmovant based upon the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *AshBritt, Inc.*, ASBCA Nos. 56145, 56250, 09-2 BCA ¶ 34,300 at 169,434.

In deciding a summary judgment motion, we do not resolve factual disputes but ascertain whether a genuine issue of material fact exists. *Delta Industries*, 12-1 BCA ¶ 34,959 at 171,860. The moving party bears the burden to show the absence of any genuine issue of material fact. If it does, the nonmoving party must then set forth specific facts showing a genuine issue of material fact. We resolve any significant doubt over factual issues, and draw all reasonable inferences, in favor of the party opposing summary judgment. *Mingus Constructors*, 812 F.2d at 1390-91; *WEDJ/Three C's, Inc.*, ASBCA No. 56672, 10-1 BCA ¶ 34,315 at 169,499, *aff'd*, *WEDJ/Three C's, Inc. v. Gates*, 382 F. App'x 928 (Fed. Cir. 2010).

## Termination for Default Standards

A termination for default should be imposed only for good grounds and on solid evidence, *J.D. Hedin Construction Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969), and the government bears the burden to prove it was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764-65 (Fed. Cir. 1987). If it does, then the contractor has the burden to show that its default was excusable. *ADT Construction Group, Inc., by Timothy S. Cory, Chapter 7 Trustee*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,309, *recon. denied*, 14-1 BCA ¶ 35,508.

The contract's Default clause allows the government to terminate for default when the contractor fails to complete the work within the time specified (SOF ¶ 2). The government may surrender its right to terminate for default, however, if it elects to permit a delinquent contractor to continue to perform past the contract completion date, assuming the contractor has not abandoned performance and a reasonable time has elapsed for issuance of a termination notice. *DeVito*, 413 F.2d at 1153; *Technocratica*, ASBCA No. 47992 *et al.*, 06-2 BCA ¶ 33,316 at 165,187.

In *DeVito*, the government terminated a supply contract for default. The contractor alleged excusable delays and that the government had waived the delivery

date. Based upon what it described as undisputed facts, the court granted summary judgment for the contractor that the government had waived the delivery schedule, calling for conversion of the default termination to one for the government's convenience. The court identified the key requirements to establish waiver as follows:

> The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

413 F.2d at 1154.

As noted, what has become known as the *DeVito* "waiver" doctrine (sometimes referred to as an estoppel issue) normally does not apply to construction contracts absent unusual circumstances. *AmerescoSolutions, Inc.*, ASBCA No. 56811, 10-2 BCA ¶ 34,606 at 170,550. This is because construction contracts generally contain provisions entitling the contractor to payment for work performed after the completion date and entitling the government to liquidated damages for late completion. *Olson Plumbing & Heating Co.*, ASBCA Nos. 17965, 18411, 75-1 BCA ¶ 11,203 at 53,336, *aff'd, Olson Plumbing & Heating Co. v. United States*, 602 F.2d 950 (Ct. Cl. 1979). When there are such provisions, "detrimental reliance...cannot be found merely from a period of Government forebearance coupled with continued contractor performance in reliance thereon." *Brent L. Sellick*, ASBCA No. 21869, 78-2 BCA ¶ 13,510 at 66,194-95.

The determination of what constitutes a reasonable forbearance period is fact-dependent. *BYA Int'l, LLC*, ASBCA No. 57608, 13 BCA ¶ 35,196 at 172,696; *American AquaSource, Inc.*, ASBCA No. 56677, 10-2 BCA ¶ 34,557 at 170,416, *recon. denied*, 10-2 BCA ¶ 34,590. The period for termination after default is greater when the contractor abandons performance or when the circumstances indicate that it is unlikely to perform within a reasonable time. *Olson Plumbing & Heating Co. v. United States*, 602 F.2d at 956; *see also American AquaSource*, 10-2 BCA ¶ 34,557 at 170,416. A lengthy delay alone is insufficient to find a *DeVito* waiver. "The purpose of the waiver doctrine is to protect contractors who are led to believe that time is no longer of the essence and undertake substantial efforts after the performance date specified in the contract has passed." *State of Florida, Dep't of Insurance v. United States*, 81 F.3d 1093, 1096 (Fed. Cir. 1996). Thus, even if the government has not insisted upon strict adherence to a performance due date, the contractor must demonstrate that it detrimentally relied upon the government's failure to do so. *See E.O. Manufacturing Co.*, ASBCA No. 52120, 01-2 BCA ¶ 31,587 at 156,084.

Moreover, even if the government has waived a contract completion date, it may still terminate a contract for default if the contractor abandons performance or materially breaches other contract obligations. *Polyurethane Products Corp.*, ASBCA No. 42251, 96-1 BCA ¶ 28,154 at 140,544. A refusal to perform without a contract change can be anticipatory repudiation or breach. *Free & Ben, Inc.*, ASBCA No. 56129, 11-1 BCA ¶ 34,719 at 170,954, *recon. denied*, 12-1 BCA ¶ 34,966; *Tri-Star Defense*, ASBCA Nos. 46650, 48418, 98-1 BCA ¶ 29,482 at 146,309. The Disputes clause required the contractor to proceed diligently with contract performance, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract (SOF ¶ 2). We have held that a contractor's failure to proceed accordingly is a "material breach for which summary termination is proper under the government's common law rights reserved in...the Default clause whenever it occurs and without regard to the specified completion date of the contract." *All-State Construction, Inc.*, ASBCA No. 50586, 06-2 BCA ¶ 33,344 at 165,341-42 (citations omitted), *recon. denied*, 07-1 BCA ¶ 33,509. However, we have recognized that performance impossibility can be a mitigating factor. *Olson Plumbing*, 75-1 BCA ¶ 11,203 at 53,336 ("[u]nless completion had been rendered impossible," or some other facts gave the contractor the right to repudiate the contract, stopping work and refusing to perform results in anticipatory breach for which termination is justified).

## Material Factual Disputes Preclude Summary Judgment

There are numerous factual disputes. At least the following are material to appellant's motion for summary judgment.

Appellant contends that, as of the end of February 2011, it and its subcontractor had completed all required items of work for Well #1 (app. mot. at 2-3, PF 6). The government asserts that:

> MIC/CCS failed to install the 10" liner, filter pack, and pea gravel in a manner acceptable to the government or consistent with FAR 52.236-5 Material and Workmanship and FAR 52.246-21 Warranty of Construction. MIC/CCS did not perform the 72-hour constant rate test on Well #1 or fully install the pump. Because of the defective construction of Well #1, the 10" liner allowed sand and pea gravel to fill the well. Thus, MIC/CCS did not request final inspection pursuant to the contract and the Government did not accept the defective work.

(Gov't opp'n at 4, ¶ 6) (Citations omitted)

20

The parties dispute, in essence, whether Layne stopped work (*see* app. mot. at 4, PF 15; *see* gov't opp'n at 6, ¶ 15).

The parties dispute, in essence, whether completion of Well #7 using the reverse rotary drilling method was feasible (*see* app. mot. at 4, PF 16; *see* gov't opp'n at 6, ¶ 16).

The parties dispute the intent and import of the 13 July 2011 communications between Mr. Newberry and the CO and whether the CO directed appellant to stop work on Well # 7 (app. mot. at 5-6, PF 20, 21; gov't opp'n at 7, ¶¶ 21-22; SOF ¶¶ 38, 39).

The parties dispute what occurred at the 7 November 2011 meeting among the CO, other government personnel, MIC/CCS and Layne (SOF ¶ 45). Appellant alleges that MIC/CCS and Layne advised the Air Force that they would begin demobilizing equipment at Well #7 to mitigate standby charges and that more work on Well #7 using the reverse rotary drilling method would be futile. Appellant contends that the Air Force did not express any disagreement or provide direction. It did not respond to the differing site conditions claim or authorize additional effort at Well #7. Rather, the Air Force acknowledged that it had taken no action on the claim, said that it had no funds to pay for the claim, and it was still attempting to find money to fund an independent consultant. Appellant alleges that the Air Force stated that it could not give a date on which its analysis would be complete but it would provide a letter with a schedule for resolving the claim. However, the Air Force never provided the letter. Appellant further contends that MIC/CCS reiterated at the meeting that it considered the Well #1 work to be complete. It had submitted a proposal for additional work to cure the sand problem but the Air Force had not responded. (App. mot. at 7-8, PF 31, 32)

The government alleges that, despite the CO's statements at the 7 November 2011 meeting that the DO work was not complete and that MIC/CCS should continue to work to meet contract requirements, the contractor refused to continue unless a change order were issued immediately to change the drilling method and increase the funding. The government contends that the CO explained that the Air Force was conducting a differing site condition investigation through an independent study but MIC/CCS stated that, no matter the outcome, it would not continue work, and the contractor reiterated this point in later correspondence. The government states that MIC/CCS never submitted a formal proposal for a change order and notes that it did not submit a claim requesting a CO's final decision regarding conditions at Wells #1 and #7 until 22 October 2012. The government also disputes MIC/CCS's assertions about the futility of continued performance and that it said at the meeting that it had no funds to pay a differing site conditions claim. The government adds that it never promised a claim schedule letter. (Gov't opp'n at 8-9, ¶¶ 31, 32)

21

The parties also dispute in part what occurred during the 5 March 2012 meeting (SOF ¶ 53). Appellant contends:

> The Air Force initially threatened MIC/CCS with termination for default, notwithstanding its earlier commitment that legal matters would not be discussed. Mr. Newberry reminded the Air Force of...the lack of basis for such a termination.... [T]he Air Force asked MIC/CCS to waive the "no guarantee" terms of the contract, but MIC/CCS refused. MIC/CCS offered to provide a proposal to resolve the problems with Well #7, and the Air Force agreed to review the proposal.... Mr. Newberry offered that MIC/CCS would be willing to forgo its mark-up on Layne's proposal to try another drilling method, and that he would also work to reduce the subcontractor stand-by charges incurred to date. [He] offered to discuss giving up its profit on the entire [DO], if needed to effect a workable proposal for resolution. The parties discussed the alternate cable-tool drilling method to be used. They also discussed drilling at a different location, but the Air Force remained committed to the same location....[T]he Air Force requested a cost proposal...[containing] "all contingencies" to attempt to perform additional work on Well #7. MIC/CCS agreed to provide such a cost proposal. The same day MIC/CCS sent an email to the [CO] confirming that it had contacted [Layne] to develop the requested proposal.

(App. mot. at 10, PF 41) (Citations omitted)

The government alleges:

> The Air Force did not threaten MIC/CCS; it only discussed all possible outcomes of the current situation. The Air Force did not ask MIC/CCS to waive the "no guarantee" terms of the contract. The Air Force did not request a cost proposal to perform "additional work." Instead, the Air Force initially requested a cost proposal to reach a final agreement on "how to rescue this task order." Dispute that MIC/CCS sent an email..."confirming" that Layne was developing the requested proposal. The cited email states that MIC/CCS was unable to reach Layne but would try again. Otherwise, the Air Force does not dispute.

(Gov't opp'n at 10, ¶ 41) (Citations omitted)

At the core of matters, the parties dispute whether the government's alleged delay in terminating the DO for default was reasonable and whether appellant relied to its detriment upon that alleged forbearance.

*DeVito's* first factor calls for the Board to determine whether the government's delay in terminating the DO was reasonable under the circumstances and whether the circumstances indicated forbearance. Summary judgment normally is not appropriate when the reasonableness of the government's actions, considering all of the circumstances, is at issue. *McKenzie Eng'g Co.*, ASBCA No. 53374, 02-2 BCA ¶ 31,972 at 157,925. We previously rejected a contractor's contention that a five and one-half month delay was *ipso facto* unreasonable, noting the fact dependent nature of the inquiry. *BYA Int'l*, 13 BCA ¶ 35,196 at 172,696.

Here, the DO's amended completion date expired on 26 September 2011 (SOF ¶ 42). The government issued a show cause notice on 6 March 2012, over five months after the completion date had passed, and terminated the DO for default on 18 June 2012, over eight months after the date had passed (SOF ¶¶ 55, 57). Between the expiration of the completion date and the termination, the government eventually conducted a differing site conditions investigation (SOF ¶ 52), the parties exchanged correspondence, and they met on 7 November 2011 and 5 March 2012. The parties debated the causes of the sand production and loss of fluids problems with the wells and whether appellant had complied with the DO, with appellant arguing that it was not required to continue performance absent a change order or equitable adjustment. Although they dispute whether appellant demobilized despite an alleged CO direction that it continue to perform, it is at least clear that appellant responded to the show cause notice that it was done with its work under the DO (SOF ¶ 56). As noted, the government is allowed more time to terminate when the contractor abandons performance or performance is unlikely.

In sum, the current record does not establish whether the government's alleged delay in terminating the DO for default was unreasonable.

The second *DeVito* factor requires that the contractor prove its reliance upon the government's failure to terminate and that it continued to perform under the contract, with the government's knowledge and implied or express consent. In fact, according to appellant, it ceased work before the DO's original and extended completion dates (SOF ¶ 38). Moreover, the government has presented evidence that counters any express or implied consent. It asserts that the CO directed appellant to continue with performance. The record is also unclear whether appellant demobilized in alleged reliance upon the government's failure to terminate, or for its own business reasons to recover its idle equipment as winter approached (*see* SOF ¶ 43). In either case, it is unclear whether it incurred costs in so doing that it would not have incurred upon completion of the DO. Thus, appellant has not established that it actually relied to its detriment upon the

government's alleged forbearance. *See E.O. Manufacturing Co.*, 01-2 BCA ¶ 31,587 at 156,084 ("Actual reliance must be demonstrated. It is not enough to merely argue that the appellant relied or could have relied.").

We have noted that "[t]o the extent we have applied the *DeVito* principle to construction cases, 'unusual circumstances' were found to exist after development of the record at a hearing." *AmerescoSolutions*, 10-2 BCA ¶ 34,606 at 170,550. In this appeal, the record similarly requires further development.

Lastly, under the Default clause, a contractor's default is excusable if it is caused by circumstances beyond its control and without its fault or negligence (SOF ¶ 2). *See, e.g., DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996); *Earthstar Construction & Logistics Co.*, ASBCA No. 58086, 13 BCA ¶ 35,461 at 173,902. There are material factual disputes as to which party was at fault for appellant's failure to perform the DO. A few examples are that the parties dispute whether MIC/CCS performed successful testing and they dispute the cause for the sand in the water at Well # 1 (app. mot. at 3, PF 7; gov't opp'n at 4-5, ¶ 7). They also dispute whether the DO specified any method of drilling (app. mot. at 2, PF 4, 5, at 5, PF 19; gov't opp'n at 3-4, ¶¶ 4, 5, at 6, ¶ 19) or of construction (app. mot. at 4, PF 15; gov't opp'n at 6, ¶ 15).

Accordingly, summary judgment is not appropriate on the questions of whether the government waived its right to terminate the DO for default or whether appellant's default was excusable.

## DECISION

We deny appellant's motion for summary judgment.

Dated: 14 May 2014

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

24

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58242, Appeal of MIC/CCS, Joint Venture, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals