ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                         )
                                                    )
Paragon Defense Solutions, Inc.                     )   ASBCA No. 64173
                                                    )
Under Contract No. SPE7L1-23-C-0011                 )

APPEARANCE FOR THE APPELLANT:           Mr. Weiwei Jian
                                          President


APPEARANCES FOR THE GOVERNMENT:         Gary P. Bilski, Esq.
                                          DLA Chief Trial Attorney
                                        John J. Pritchard, Esq.
                                        Julie K. Phillips, Esq.
                                        Adam J. Heer, Esq.
                                          Trial Attorneys
                                          DLA Land and Maritime
                                          Columbus, OH

OPINION BY ADMINISTRATIVE JUDGE EYESTER

This appeal concerns the termination for default of the above-referenced contract issued by the Defense Logistics Agency (DLA) to Paragon Defense Solutions, Inc. (Paragon). DLA argues the termination was justified because Paragon failed to supply all of the towbars purchased under the contract by the contract delivery date. In response, Paragon makes numerous arguments, including that DLA waived the delivery date and Paragon's delay was excusable.

Paragon elected to pursue this appeal pursuant to the Board's Rule 12.2, Small Claims (Expedited) procedure. Accordingly, this decision shall have no precedential value, and in the absence of fraud shall be final and conclusive and may not be appealed or set aside. 41 U.S.C. § 7106(b)(4)-(5). Paragon also pursued this appeal pursuant to Board Rule 11, in which the decision rests upon written evidence without courtroom testimony. Based on the following, we deny Paragon's appeal.

FINDINGS OF FACT

1. On September 14, 2022, Paragon submitted its offer in response to solicitation No. SPE71-22-R-0017 (R4, tab 1a). On November 3, 2022, DLA issued fixed-priced contract No. SPE7L1-23-C-0011 to Paragon in the amount of $957,600 for 72 motor

vehicle towbars for delivery by August 7, 2023 (R4, tab 1 at 1, 3-4; tab 1b). The contract incorporated by reference the solicitation and Paragon's offer (R4, tab 1 at 1, 5).

2. The contract included a follow-on option quantity of 36 towbars, which could be exercised by a modification no later than July 24, 2023. Option quantity 1-18 would be exercised at a certain unit price and option quantity 19-36 at a lower unit price. Delivery for these quantities would be 275 days after DLA issued the modification. DLA would accept expedited or partial shipments at no additional charge to the government. (R4, tab 1 at 2)

3. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.242-15, STOP-WORK ORDER (AUG 1989); 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984); and Defense Federal Acquisition Regulation Supplement (DFARS) 252.217-7026, IDENTIFICATION OF SOURCES OF SUPPLY (NOV 1995) (R4, tab 1a at 16, 19, 32). Pursuant to DFARS 252.217-7026, Paragon was to notify the government of its source of supply in its offer for part number DP8080C (*id.* at 14, 16). Paragon listed the manufacturer of this part as an entity having a company address in Purcellville, VA (*id.* at 16).

4. On November 3, 2022, Paragon issued a purchase order to its manufacturer for 72 towbars due August 7, 2023 (app. supp. R4, tab 1). On the same day, the manufacturer requested payment in order to get started, and explained the delivery could take "quite a long time compared to just a year ago when it was only 160 days to complete a build." The manufacturer noted that the current lead time was now "270 days" but would hopefully be 240 days or less. (App. supp. R4, tab 2 at 4) Paragon submitted its payment on November 4, 2022, and the manufacturer confirmed receipt on November 11, 2022 and added the parts to the production schedule for delivery in 2023 (*id.* at 1-2).

5. We find based on this email that if the production lead time were running 270 days after invoice payment, the parts would not have been ready for pick-up by Paragon until August 4 or 11, 2023. There is nothing in the record evidencing Paragon informed DLA of the fact the lead time was now longer for these parts.

6. On November 18, 2022, DLA requested Paragon expedite the order of 72 towbars and stated a partial order of 20 towbars to cover urgent backorders would be appreciated if a full order could not ship early (R4, tab 3 at 42). Paragon replied on December 23, 2022, stating it sent the purchase order request to the approved source (i.e., the manufacturer), along with a 10 percent prepayment. The manufacturer confirmed that production was scheduled and on target for delivery by the contract delivery date. (*Id.* at 43)

7. On January 25, 2023, DLA issued a unilateral modification which exercised option quantities (R4, tab 7 at 49). According to the modification, DLA would accept expedited or partial shipment by September 6, 2023, of four additional towbars (*id.* at 50).

8. On February 2, 2023, Paragon emailed the manufacturer seeking four additional units (app. supp. R4, tab 3 at 2). The manufacturer added them to the prior production order and stated it anticipated no change to the delivery schedule (*id.* at 1).

9. On March 13, 2023, DLA issued a second unilateral modification exercising additional option quantities (R4, tab 9). According to the modification, DLA would accept expedited or partial shipment by October 4, 2023, of another four towbars (*id.* at 53).

10. On the same day, Paragon contacted the manufacturer seeking a timeframe for delivery and asking if it could make a partial delivery early. Paragon noted DLA had been canceling purchase orders where delivery was late. (App. supp. R4, tab 4 at 5) Paragon did not receive an immediate response from the manufacturer (*see id.* at 1).

11. Meanwhile, on March 14, 2023, Paragon notified the DLA contract specialist that Paragon had been proposed for debarment and could not accept purchase orders over $35,000 (and that it had hired counsel to terminate the proposed debarment) (R4, tab 13 at 62). The contracting officer confirmed Paragon had been proposed for debarment on February 27, 2023, and noted that FAR 9.505-1(a)(2) precludes an agency from adding new work, exercising an option, or extending the duration of contracts and orders for contract holders proposed for debarment (or debarred and suspended). The contracting officer stated that DLA's headquarters "has not issued any written determination of compelling reasons for extending the duration of any orders/contracts awarded to Paragon" and therefore DLA was prohibited from exercising the follow-on option. (*Id.* at 61)

12. Accordingly, on March 15, 2023, DLA issued a unilateral modification canceling the prior order of four towbars due October 4, 2023 (R4, tab 16). DLA canceled the modification because it was issued in error subsequent to a debarment proposal and active exclusion in SAM.gov, issued on February 27, 2023, thereby rendering the modification void *ab initio* (*id.* at 67).

13. On May 2, 2023, Paragon asked the manufacturer again to confirm whether the parts would be ready by September 25, 2023. The manufacturer responded that same day stating they are on schedule to meet the delivery deadline. (App. supp. R4, tab 4 at 1) Minutes after receiving the response from the manufacturer, Paragon clarified it would need the manufacturer to deliver the items at least three weeks prior to August 7,

2023 (app. supp. R4, tab 5 at 3). On June 30, 2025, the manufacturer stated it was still on schedule (*id.* at 1).

14. Paragon again emailed the manufacturer on July 20, 2023, stating: "As we are approaching the Aug 7 delivery due date for our [purchase order], please advise of your firm shipment ready date" so Paragon could arrange packaging and final delivery (app. supp. R4, tab 6 at 8). Paragon emailed the manufacturer again on August 2, 2023 asking about the shipment and stating it was "very likely" DLA would cancel the contract if the parts were shipped late (*id.* at 7).

15. On August 7, 2023, Paragon again emailed the manufacturer. This email explained that the parts were to have been delivered that day; Paragon had told them several times that if it were late, DLA could cancel the contract and "[f]rom a legal perspective, DLA possesses the authority to take such action," and to outline a definitive delivery date. (App. supp. R4, tab 6 at 6) Paragon stated it could take a partial shipment as long as DLA did not cancel the contract (*id.* at 5). On August 22 and September 5, 2023, the manufacturer stated that seven towbars were almost ready and the rest would be delivered by the end of October (*id.* at 1, 3).

16. Paragon shipped and DLA received seven towbars on September 20, 2023 (app. supp. R4, tab 7c at 2). In October and November of 2023, Paragon emailed the manufacturer requesting an update on the delivery for the remainder of the items (app. supp. R4, tab 8). Paragon asked the manufacturer to explain, on letterhead, if it could not fulfill the orders or expected further delays, and the reasons why (*id.* at 1).

17. Paragon shipped and DLA received 19 additional towbars sometime after that (*see* app. supp. R4, tab 11b at 1). According to Paragon, it had delivered and DLA had accepted 26 towbars by December 2023 (compl. at 1). In other words, DLA accepted towbars after the required delivery dates.

18. The record now fast forwards to March 28, 2024, when the manufacturer invoiced Paragon for 40 tow bars. The next day, the manufacturer informed Paragon it needed payment as the "40 units are stuck in Canada until you pay me." (App. supp. R4, tab 9 at 2)

19. On March 30, 2024, the manufacturer notified Paragon it needed additional funds despite the fact the parts had not yet shipped (app. supp. R4, tab 9 at 1-2). The manufacturer stated 40 parts would be ready soon and the remaining 10 in about four weeks (*id.* at 1).

20. We find nothing in the record showing that Paragon shared any of these prior communications with DLA. Further, there is nothing in the record showing that the

contracting officer, or any DLA official, knew whether Paragon continued to perform after the last delivery it made.

21. On April 1, 2024, DLA's contracting officer issued Paragon a show cause letter stating it was considering terminating Paragon for default. The contracting officer explained that Paragon was required to deliver 72 towbars by August 7, 2023 (the base contract) and 4 additional towbars by September 6, 2023 (option award), yet Paragon had only delivered 26 towbars (22 items pursuant to the base contract and 4 pursuant to an option award). DLA paid Paragon for the 26 towbars delivered. (R4, tab 22a at 80)

22. The contracting officer further stated that pursuant to 22 U.S.C. § 2593e(c) and FAR 9.405-1, DLA could not extend Paragon's contract. More important, the contracting officer specifically stated that due to the delinquent status of the contract "you are hereby notified that you are not to initiate any further shipments of supplies under this Contract as of the date of this letter, pending your response and/or a final decision by the Government." (R4, tab 22a at 80)

23. DLA stated it was considering terminating the remaining 50 undelivered items but would first determine whether the failure to timely perform arose from causes beyond Paragon's control and without its fault or negligence. Paragon was provided 10 days to present any facts bearing on these issues. (R4, tab 22a at 80)

24. DLA offered to issue a bilateral modification reducing the quantity to zero rather than terminating for default (R4, tab 22a at 80). DLA attached a draft modification which stated that the contract was terminated because Paragon had been debarred and the agency head did not issue any written determination of compelling reasons for extending the duration of the contract. The draft modification did not mention that Paragon failed to deliver all of the required quantities on time. (R4, tab 22b at 83)

25. The contracting officer stated in the show cause letter that DLA had not provided any extension to the delivery date. The contracting officer noted the following payment dates: $39,900 on November 9, 2023 for the base contract; $56,000 on November 9, 2023 for the option; and $252,700 on January 25, 2024 for the base contract. (R4, tab 22a at 80)

26. Also on April 1, 2024, Paragon emailed the manufacturer stating that it needed a written statement detailing the reasons for the delay in order to respond to a show cause letter. The manufacturer stated that 40 towbars were complete and the final 10 would be processed in four weeks, and the delay was due to the government placing other

5

programs with DX ratings[1] ahead of their deliveries and the supply chain materials were just now becoming readily available.  (App. supp. R4, tab 10 at 1)

27.  The manufacturer provided a formal response on its letterhead, dated April 4, 2024 (app. supp. R4, tab 11b).  This response expounded on its initial email, explaining first the supply chain issue:  the manufacturer expedited material it could get from warehouses which reduced profit but needed to did this because chromoly steel tube was delayed in 2023; therefore, what should have been a 10-week turn around became an eight-month ordeal of scrambling to get material.  Further, with respect to the DX ratings, the manufacturer stated that the government orders for howitzer shells and other higher prioritized items pushed their material requests further back in the queue.  The manufacturer again stated it would have 40 units for DLA to pick up in by April 17 and the remaining 10 units by May 10.  (*Id.* at 1)

28.  On April 10, 2024, Paragon told its manufacturer it would pay the additional money requested (app. supp. R4, tab 13a).  Paragon provided to the Board a copy of a receipt from its certified public accountant showing a charge of $50,000 (app. supp. R4, tab 13b).  Paragon failed to provide anything showing the money was actually paid to its manufacturer, despite the fact it was able to provide an email confirming a prior payment made in November 2022 (app. supp. R4, tab 2).  Further, assuming Paragon paid this money to the manufacturer, it did so after DLA issued Paragon the show cause letter and warned Paragon not to initiate any further shipments (R4, tab 22a at 80).

29.  Paragon responded to the show cause letter on April 9, 2024 acknowledging the "gravity of the situation" in only delivering 26 of a total 76 units ordered (R4, tab 23a at 85).  Paragon assured DLA it was ready and able to make the remaining deliveries as follows:

- The next delivery:  40 units are scheduled to be shipped from Nashville, Tennessee, with an *anticipated* ship date of April 20, 2024.

- Final delivery:  10 units will be completed within an additional four weeks, with *a projected shipment date* of May 20, 2024.

(*Id.*) (emphasis added).  Note that Paragon's proposed delivery scheduled failed to provide firm shipment dates.

---

[1] FAR 11.603(a) explains that there are two levels of priority for rated orders--DO and DX.  DX rated orders take priority over DO rated orders.  FAR 11.603(a).  The contract at issue here was DO rated (R4, tab 1 at 1).

30. Paragon also stated the following as its explanation for the delay:

> We understand that the delivery schedule for this contract has taken longer than originally anticipated. The primary cause of the delay stems from significant disruptions in supply chain, particularly with the acquisition of essential raw materials required for the manufacturing process. Despite our best efforts to expedite the order and collaborate closely with our subcontractors (*i.e.*, the approved source), we encountered unforeseen challenges beyond our control. Despite calling out the "DO" contracting rating to second- and third-tier suppliers we were not able to force a quicker response.

(R4, tab 23a at 85). As an offer of goodwill, and "*for consideration for extending the delivery date*," Paragon offered to provide two additional towbars free of charge in the final delivery or provide a discount to the government in the amount of $25,994 (*id.* at 85-86)(emphasis added). In other words, at this point Paragon was aware the delivery date had not been extended.

31. Paragon also disputed the citation to 22 U.S.C. § 2593e(c) because it applied to arms control violations. It also disputed that FAR 9.405-1 precluded the agency from continuing the contract here as no extension was required. (R4, tab 23a at 86)

32. Paragon did not include any attachments, such as the copy of its manufacturer's letter or any of the emails it had sent its manufacturer and the replies (*see id.*). Nor did it include any documents showing it paid the manufacturer for the next shipment (*see id.*).

33. DLA informed Paragon that the position set forth in the show cause response was without merit (R4, tab 26). On April 15, 2024, DLA issued a unilateral modification decreasing the quantity of items to be delivered to zero. DLA issued the modification, citing FAR 9.405-1, due to Paragon's active exclusion and debarment from contracting, effective February 27, 2023, and in the absence of the agency head issuing a written determination to extend the duration of the order (R4, tab 25 at 88-89). In the modification, DLA stated Paragon's show cause letter "provided no indication that the Government had, in any way, encouraged performance on this contract past the" due date of August 7, 2023 (R4, tab 25 at 89). Only six days elapsed between Paragon's response to the show cause and the termination.

34. On July 8, 2024, Paragon submitted its claim to the contracting officer seeking a total of $65,150 (loss of profit of $15,150 and prepayment of $50,000 made prior to termination). Paragon argued the delay in delivery was due to supply chain issues. (R4, tab 31 at 209) The contracting officer did not issue a final decision.

7

35. Both parties agree that there was a termination for default and that Paragon was paid for prior deliveries (app. br. at 2-3; gov't br. at 2, 5).

DECISION

Both parties acknowledge that "a default-termination is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969)). Because a termination for default is essentially a government claim, the government bears the burden of proving that a termination for default was justified. *DayDanyon Corp.*, ASBCA No. 57681, 15-1 BCA ¶ 36,073 at 176,151, *aff'd*, 600 F. App'x 739 (Fed. Cir. 2015).

The contract's incorporated default clause (finding 3) states the government may, by written notice of default, terminate the contract when the contractor fails to deliver the supplies within the time specified in the contract or any extensions of time. FAR 52.249-8(a)(1)(i).[2] DLA stated that the termination was due to Paragon's failure to deliver the entire quantity by the contract delivery dates (finding 21). There is no dispute that Paragon failed to comply with the contract's delivery schedule. This failure to make timely delivery, by law, establishes a prima facie case of default. *Delfasco LLC*, ASBCA No. 59153, 17-1 BCA ¶ 36,659 at 178,526 (citations omitted); *see also* FAR 52.249-8(a)(l)(i).

In response, Paragon argues DLA waived the contract delivery dates by accepting late deliveries and failed to set a new date as required by FAR 49.402-3(c) (app. br. at 3; app. reply at 2, 4). Specifically, FAR 49.402-3(c) states that where the contractor defaults for failure to deliver supplies by the contract delivery date, and the government waives the date, the contracting officer shall send a notice to the contractor setting forth a new date for the delivery, still reserving the government's rights under the default clause. Paragon's waiver argument is an affirmative defense for which it bears the burden of proof. *Delfasco LLC*, 17-1 BCA ¶ 36,659 at 178,526 (citations omitted).

To prove DLA waived the delivery date here, Paragon must demonstrate the following: (1) DLA failed to terminate within a reasonable time after the default under circumstances indicating forbearance; and (2) Paragon relied on the failure to terminate and continued performance under the contract with DLA's knowledge and implied or express consent. *DeVito v. United States*, 413 F.2d 1147, 1154 (Ct. Cl. 1969). Here, DLA accepted towbars months after the contract delivery date (findings 16 and 17).

---

[2] We note that no cure notice is required when the termination for default is for late supplies.

8

Paragon argues this acceptance without objection of the late delivery constituted a waiver (app. br. at 3; app. reply at 4). The Board has stated before that "[a]s a general rule, nonaffirmative government action is less likely to constitute government waiver than affirmative actions." *Delfasco LLC*, 17-1 BCA ¶ 36,659 at 178,529 (citing *DayDanyon*, 15-1 BCA ¶ 36,073 at 176,153). In other words, because it is difficult to determine whether the government is forbearing a termination for default to assess the situation or continue the contract, the Board reviews the government's actions to see if they are nonaffirmative (indicating forbearance) or affirmative (indicating an election and waiver of the delivery schedule). *Tectron Corp.,* ASBCA No. 12901 *et al.,* 73-1 BCA ¶ 9786 at 45,719. Accordingly, the Board has explained that waiver of the delivery schedule may be evidenced by: (1) government conduct reasonably believed by the delinquent contractor to constitute encouragement to proceed with performance after the contract delivery date has passed; and (2) the delinquent contractor relying on this conduct to incur costs of performance. *AEY, Inc.,* ASBCA No. 56470 *et al.,* 18-1 BCA ¶ 37,076 at 180,471 *(quoting Tectron Corp.,* 73-1 BCA ¶ 9786 at 45,719).

The last delivery appeared to have occurred in December and the government issued a show cause in April (findings 17, 21). Although this is four months, during that time there is nothing in the record evidencing affirmative government conduct. Specifically, there is nothing showing that DLA encouraged or provided consent for Paragon to continue performing or even that DLA had knowledge Paragon was still performing. Specifically, Paragon did not share with DLA any of the communications and issues it had with the manufacturer (findings 5, 20). In fact, according to Paragon's own facts, between March 2023 and March 2024, it "maintained consistent communication regarding production status" with its manufacturer; Paragon does not state anywhere it informed DLA of these facts (app. br. at 2). Thus, there is no evidence that there was government conduct encouraging Paragon to proceed from the time of the last delivery to the show cause letter.

Further, in DLA's show cause letter it stated that not only was Paragon delinquent, but that DLA did not provide any extensions (finding 25). In other words, DLA stated it did not consent to continued performance. Therefore, DLA had no knowledge and did not provide any consent, implied or express, for Paragon to continue performance.

The biggest problem with Paragon's argument, however, is that it is primarily seeking reimbursement for money paid for performance *after* DLA issued the show cause letter (finding 34 stating it is seeking a prepayment of $50,000 made prior to termination). Paragon admits it made this payment "just days after receiving the Show Cause Notice" to cure any delay, and at its "own risk, without any assurance of contract preservation" (app. br. at 5-6). In the show cause letter, however, the contracting officer specially instructed Paragon "not to initiate any further shipments of supplies under this Contract as of the date of this letter, pending your response and/or a final decision by the Government" (finding 22). Paragon argues this statement was not a stop work order

9

issued under FAR 52.242-15 and thereby Paragon could take steps to cure and mitigate (app. reply at 5). We find this argument wholly unavailing. This letter did not encourage Paragon in any way to incur these expenses and as Paragon itself admits, it made this payment at its own risk knowing the contract could be (and ultimately was) terminated for default. In sum, there was no waiver of the contract delivery date.

Next, Paragon argues that the delay was excusable pursuant to FAR 52.249-8[3] because the delay arose from issues beyond Paragon's control. FAR 52.249-8(c) explains that the contractor "shall not be liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the contractor." The FAR includes examples, including acts of the government in either its sovereign or contractual capacity or quarantine restrictions. FAR 52.249-8(c); *see also* FAR 52.249-8(d) (relating to default of subcontractor where cause is beyond control of contractor and subcontractor).

Paragon argues that the sole government-approved manufacturer encountered unavoidable sourcing delays due to COVID-19 related disruptions and priority displacement by DX-rated contracts (app. br. at 4-5; app. reply at 1-2, 4). Further, Paragon contends it acted in good faith by maintaining active coordination with the manufacturer and shipping the items as soon they became available (app. br. at 5). Paragon explained that it was ready to ship additional units and offered consideration to DLA to mitigate the delay (*id.*).

Paragon's response to DLA's show cause letter included a summary explanation that there were supply chain issues (finding 30). Most curious is the fact that, despite specifically asking for a statement from its manufacturer on letterhead of the reasons for the delay, Paragon failed to include the letter as an attachment, and failed to provide copies of any of the relevant emails it had sent its manufacturer and the replies (finding 32).

For our purposes, we note that there seemed to be payment issues between Paragon and its manufacturer (findings 18-19), Paragon was able to provide some shipments to DLA despite the alleged issues of supply chain and the DX rating, and the information relating to the alleged issues with the supply chain and DX rating only came to light after DLA issued the show cause letter (findings 26-27). Further, Paragon knew shortly after award that there could be a long lead time and did not notify DLA until after receiving a show cause letter (findings 4-5). The Board has stated before that material shortages do not *per se* relieve a contractor of its contractual obligations. *Eppco Metals Corp.*, ASBCA No. 38305, 90-1 BCA ¶ 22,349 at 112,304 (appellant knew in June of the

---

[3] Paragon also cites to FAR 52.249-14, EXCUSABLE DELAYS as support (app. br. at 4; app. reply at 2) but that clause, applicable to cost reimbursement contracts (but not the fixed-priced contract we have here), was not included either explicitly or by reference into the contract.

long lead time but failed to act promptly and waited until September to notify the government): *Precision Standard, Inc.,* ASBCA No. 44357, 96-2 BCA ¶ 8,461 at 142,155. At the end of the day, Paragon failed to demonstrate excusable delay; it was reasonable for DLA to terminate the contract for default.

Finally, Paragon argues that all of this, including the issuance of the show cause letter itself, evidences the contracting officer acted in bad faith, retaliated against Paragon, breached its duty of fairness and that the termination was arbitrary capricious, and an abuse of discretion (app. br. at 9-11). To support these arguments, Paragon contends the termination was procedurally defective based on the following: the Rule 4 file lacks evidence that DLA contracting, technical and legal personnel reviewed the termination for default before issuing it as required by FAR 49.402-3(a); DLA violated FAR 49.402-3(b) by issuing a show cause notice without prior approval from the contracting office; DLA was required, pursuant to FAR 49.402-3(e)(4), to notify the Small Business Administration Area Office of the show cause notice, and failed to do so; and DLA failed to consider the available remedies set forth in FAR 49.402-3(f) prior to terminating the contract for default (app. br. at 3-4, 6; app. reply at 2-3, 5).

We find these arguments without merit. The Board has stated before that the government's internal procedures for consultation and monitoring of the contract are for its benefit and do not establish a contractual right enforceable by the appellant. *Liltcom Div., Litton Syst.*, ASBCA No. 13413, 78-1 BCA ¶ 13022 at 63,525; *see also DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996) ("A contracting officer's failure to consider one or more of the [factors in [FAR] 49.402-3(f)] does not require that a default termination be converted into a termination for . . . convenience."); *United Partition Sys., Inc. v. United States,* 90 Fed.Cl. 74, 88 (2009) ("For a default termination to be converted to a termination for convenience on the basis of procedural error, the contractor bears the burden to show that it was harmed or prejudiced by the government's error."); *Balimoy Mfg. Co. of Venice, Inc.*, ASBCA Nos. 47140, 48165, 98-2 BCA ¶ 30,017 at 148,511 (failure to provide show cause letter to SBA did not affect an otherwise proper default termination where the contractor was not prejudiced by the omission).

There was no prejudice to Paragon. Paragon knew from the start of the contract that the deliveries could be late and did not tell DLA (findings 4-5). Paragon knew that DLA could terminate its contract if it were late and had the legal right to do so (findings 10, 14-15). And in response to the show cause letter, Paragon could still not provide firm delivery dates and failed to adequately substantiate its response to the show cause letter (findings 29, 32). As DLA has demonstrated that Paragon was late and all of Paragon's

11

other arguments have failed, we cannot find any reason to convert this termination for default to one for convenience.[4]

CONCLUSION

DLA's termination for default of Paragon's contract stands and the appeal is denied.

Dated: September 19, 2025

_____
LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 64173, Appeal of Paragon Defense Solutions, Inc., rendered in conformance with the Board's Charter.

Dated: September 18, 2025

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

---

[4] We have reviewed and considered Paragon's other arguments and find them without merit (e.g., erroneous citations in the show cause letter) (app. br. at 7-8; app. reply at 8).

12